**In re EWALD BROS., INC., Debtor.**

**EWALD BROS., INC., Plaintiff,**

v.

**KRAFT, INC., Defendant.**

Adv. No. 4–82–131.
Bankruptcy No. 4–80–1653.

United States Bankruptcy Court,
D. Minnesota.

Oct. 26, 1984.

Michael D. Schwartz, of Stern, Levine & Schwartz, P.A., St. Louis Park, Minn., for plaintiff.

William Babcock, of Oppenheimer, Wolff, Foster, Shepard & Donnelly, St. Paul, Minn., for defendant.

## ORDER

MARGARET A. MAHONEY, Bankruptcy Judge.

The above-entitled matter came to trial before the Honorable Margaret A. Mahoney on September 10, 1984. Plaintiff filed its complaint on March 16, 1982, alleging

preferential transfers by Defendant pursuant to 11 U.S.C. § 547. Defendant denied Plaintiff's allegations and counterclaimed for a setoff in an amount equal to that which Defendant would be entitled to receive pursuant to Plaintiff's October 15, 1981 plan of reorganization. The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and 1334 (enacted 1984).

## FACTS

With some exceptions, the facts are undisputed. Plaintiff and Defendant are, and at all material times were, duly organized and existing corporations. Plaintiff is engaged in wholesale and retail distribution of dairy products, and prior to August 22, 1980, was also engaged in processing milk and other dairy products. On October 14, 1980, an involuntary petition in bankruptcy was filed. As of October 30, 1980, the Order for Relief was signed and Plaintiff operated its business as debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108. Plaintiff's amended plan of reorganization was confirmed on October 15, 1981.

For a number of years prior to the filing of the involuntary petition, the parties had been operating under a written agreement whereby Defendant agreed to supply and Plaintiff agreed to purchase raw milk for processing by Plaintiff.[1] Pursuant to the terms of the agreement, Plaintiff was to make payment on or before the 25th day of each month for all milk delivered during the first fifteen days of that same month. For all milk delivered from the sixteenth day of the month to the end of the month, Plaintiff was to make payment on or before the 15th day of the following month. The agreement contained no provision concerning the making of split payments or the delivery of milk on a C.O.D. basis.[2]

Despite the plain wording of the agreement, payments were not always made precisely on the 15th and 25th of each month. In fact, payments had been one or two days late for several years. Prior to August 1, 1980, however, Plaintiff had never made a split payment to Defendant for any of the milk purchased. Moreover, prior to August 5, 1980, Plaintiff had never been placed on a C.O.D. basis by Defendant.

From June 16 to June 30, 1980, Plaintiff purchased $196,291.71 worth of milk. Under the terms of the agreement between Plaintiff and Defendant, payment in this amount was due to Defendant on July 15, 1980. Payment was attempted by Plaintiff by way of a check dated July 15, 1980. The check, however, failed to clear Plaintiff's bank due to nonsufficient funds. It was later redeposited by Defendant and cleared Plaintiff's bank on July 24, 1980, nine days after the debt was originally due to be paid. Prior to June 15, 1980, no checks from Plaintiff had been returned for nonsufficient funds.[3]

---

1. The terms of the agreement are specified in an August 3, 1979, confirmatory letter from Defendant's milk procurement manager, Dennis Braun, to Rodney Pitsch, president of Plaintiff. That letter, a copy of which was signed by both Mr. Braun and Mr. Pitsch, specified the terms of the agreement for the September 1, 1979, through August 31, 1980, marketing year.

2. The August 11, 1980, confirmatory letter from Mr. Braun for the September 1, 1980, through August 31, 1981, marketing year altered the previous year's payment provision by adding the following superseding paragraph:

 Payments will be made by Ewald on a cash basis for milk delivered according to terms specified by Kraft. Paragraph 4B [this paragraph] shall supersede paragraph 4A [which provides for payment on the 15th and 25th of each month] until the indebtedness and terms of the attached promissory note dated August 4, 1980 have been completed, or *again at any time when payments are not received in accordance with paragraph 4A.*

 Defendant's Trial Exhibit No. 3 at 1 (emphasis added).

3. There was conflicting testimony at trial as to whether any additional checks had been returned due to nonsufficient funds. Mr. Pitsch testified on cross-examination that there had been two such checks. Mr. Braun testified on cross-examination, however, that no checks had been returned prior to June 1980. Defendant's brief either adds to or clears up the confusion by indicating that a second NSF check was in fact involved in the attempted payment of Plaintiff's July 1–15, 1980, debt, which was ultimately handled by way of subsequent split payments. *See* text, *infra*. While it may be that such a

From July 1 through July 15, 1980, Plaintiff purchased from Defendant $181,316.07 worth of milk. According to the express terms of the agreement between Plaintiff and Defendant, payment in that amount was due on July 25, 1980. No payment was received on that day, however.

On July 30, 1980, a meeting was held at the office of Rodney L. Pitsch, Plaintiff's president and chief executive officer. Defendant's milk procurement manager, Dennis Braun, and the manager of Defendant's milk producing plant in Melrose, Minnesota, Roger Weidl, were also in attendance at that meeting. Testimony by Mr. Braun indicated that the meeting was preceded by phone conversations between the parties on May 25 and June 27, 1980, concerning the fact that Plaintiff's payments had been getting later. Moreover, the meeting was followed by several additional phone conversations. These conversations apparently related to the subject matter of the meeting. The purpose behind the meeting was to discuss the increasingly late payments made by Plaintiff, including Plaintiff's July 24 and, as yet unpaid, July 25, 1980 payments. According to testimony by Mr. Pitsch, Plaintiff's cash flow problem was also discussed. Messrs. Braun and Weidl were apparently informed by Mr. Pitsch that Plaintiff was attempting to arrange further financing. Defendant's concerns were not allayed, however, as Defendant expressed to Plaintiff at that time or soon thereafter that beginning August 5, 1980, future milk shipments would occur on a C.O.D. basis only.

In partial payment of Plaintiff's July 25, 1980, obligation, Plaintiff ultimately transferred $125,000 to Defendant after the July 30 meeting, on August 1, 1980, seven days after the debt was to be paid. The remaining $56,316.07 owed by Plaintiff on its July 25 obligation was not paid until twelve days after the due date, on August 6, 1980. Prior to this time, Plaintiff had never made partial payments on its obligations to Defendant.

From July 16, to July 31, 1980, Defendant shipped to Plaintiff milk valued at $208,633.31. According to the terms of the earlier agreement between Plaintiff and Defendant, payment in that amount was due on August 15, 1980. Defendant never received any payment whatsoever on this specific debt.

In the month of August, 1980, Defendant shipped to Plaintiff milk having a value of $343,520.41. Of the shipments during this time, $47,150 of milk were shipped by Defendant to Plaintiff prior to the C.O.D. period, which, as indicated above, was set to commence on August 5. The remainder of the August shipments,[4] which were governed by the new C.O.D. arrangement, totalled $296,370. In exchange for the C.O.D. shipments, Plaintiff wire-transferred funds totalling $331,000 as estimates of the milk purchased.[5] No payment was ever received for the $47,150 of milk shipped between August 1–4.[6]

Specifically, Plaintiff contends that the following are preferred transfers and

second NSF check existed, it was not adequately established at trial, nor would it affect the Court's determination had it been so established.

**4.** Shipments apparently continued until about August 22, 1980.

**5.** Testimony from both Messrs. Braun and Weidl indicated that the parties' C.O.D. relationship functioned as follows: (1) Plaintiff would notify Defendant on the day prior to shipment of the amount of milk to be shipped; (2) Defendant would estimate the value of milk to be shipped by adjusting the set 100-pound rate by the previous month's butter fat rate; (3) Defendant would withhold shipment of the milk until

notified that payments equal to the estimated value had been deposited by Plaintiff in Defendant's Minneapolis lockbox. Twelve wire-transfer confirmations from First Bank Minneapolis for August 5 to August 26, 1980, ranging in amounts from $27,000 to $40,500, were sent to Defendant. In the aggregate, these transfers totalled $331,000.

**6.** It is Defendant's contention that the wire transfers totalling $331,000 should be applied to the entire $343,520.41 debt for August 1980. By the testimony of Messrs. Pitsch, Braun and Weidl, however, it is clear that these payments were never intended by either party to constitute payment of the August 1–4 debt. *See* text, *infra.*

should be avoided pursuant to 11 U.S.C. § 547(b)[7]: (1) its June 24, 1980, transfer of $196,291.71; (2) its August 1, 1980, transfer of $125,000.00; (3) its August 6, 1980, transfer of $56,316.07; and (4) $34,630.00 of its $331,000.00 of transfers from August 5 to August 22, 1980.[8] The parties stipulated that the requirements of section 547(b) were met. However, Defendant asserts that such transfers are governed by 11 U.S.C. § 547(c)(1) and (2) and, therefore, may not be avoided. Both parties agree that all transfers at issue were made not later than 45 days after the respective debts were incurred, pursuant to 11 U.S.C. § 547(c)(2)(B).

## DISCUSSION

 It is clear that the four transfers at issue here may be avoided pursuant to 11 U.S.C. § 547(b) unless Defendant is correct in its assertion that exceptions exist under 11 U.S.C. § 547(c)(1) and (2).[9] To preclude avoidance, it remains for Defendant to establish that the transfers were either a contemporaneous exchange or (1) in payment of a debt incurred in the ordinary course of Plaintiff's business, (2) made in the ordinary course of Plaintiff's and Defendant's businesses, and (3) made according to ordinary business terms. 11 U.S.C. § 547(c)(1), (2)(A), (C), (D) (1982).[10] The burden is on the creditor to establish the § 547(c)(1) and (2) affirmative defenses. *In re Saco Local Development Corp,* 30 B.R. 867 (Bkrtcy.D.Me.1983). As to all four transfers, I conclude that Defendant has not met its burden of proof.

There has been substantial litigation concerning the section 547(c)(2) ordinary course of business exception. Much of it, however, has concentrated primarily on

7. Section 547(b) provides in full:

> (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made—
> (A) on or before 90 days before the date of the petition; or
> (B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer—
> (i) was an insider; and
> (ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and
> (5) that enables such creditor to receive more than such creditor would receive if—
> (A) the case were a case under chapter 7 of this title;
> (B) such transfer had not been made; and
> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b) (1982).

8. The parties agree that $296,370.00 of Plaintiff's August 5 through August 22, 1980, transfers may not be avoided as such transfers were intended to be and were in fact a contemporaneous exchange for new value given to Plaintiff pursuant to 11 U.S.C. § 547(c)(1) (1982).

9. Section 547(c) provides in part:

> (c) The trustee may not avoid under this section a transfer—
> (1) to the extent that such transfer was—
> (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
> (B) in fact a substantially contemporaneous exchange;
> (2) to the extent that such transfer was—
> (A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;
> (B) made not later than 45 days after such debt was incurred;
> (C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
> (D) made according to ordinary business terms;

11 U.S.C. § 547(c)(2) (1982).

10. There appeared to be some dispute at trial as to whether all four elements of § 547(c)(2) must be met to establish an exception to § 547(b). The statutory elements are clearly worded in the conjunctive. Consequently, Plaintiff need only establish the nonexistence of one of the remaining elements at issue as to each transfer in order to refute a § 547(c)(2) exception. *See In re Federal Tool, Inc.,* ADV 4–81–384, BKY 4–80–1915 (Bankr.D.Minn. March 26, 1982); *In re Hersman,* 20 B.R. 569 (Bankr.N.D.Ohio 1982); *Matter of Donny,* 11 B.R. 451 (Bankr.W.D.Wis. 1981). Defendant asserts a section 547(c)(1) defense only with respect to Plaintiff's claim for $34,630.00 which was allegedly overpaid to Defendant between August 5 and August 22.

whether the 45 day requirement has been met. *See, e.g., Matter of Emerald Oil Co.,* 695 F.2d 833 (5th Cir.1983); *In re Iowa Premium Service Co., Inc.,* 695 F.2d 1109 (8th Cir.1982); *In re Hoover,* 32 B.R. 842 (Bkrtcy.W.D.Okla.1983); *In re Saco Development Corp., supra; In re Satterla,* 15 B.R. 166 (Bkrtcy.W.D.Mich.1981); *In re Keeling,* 11 B.R. 361 (Bkrtcy.D.Minn.1981). Few decisions have fully addressed the other elements of the exception. Consequently, just what constitutes the ordinary course of the debtor's and transferee's businesses or ordinary business terms remains somewhat unclear.

■ Although some commentators have questioned the standard to be applied to the "ordinary course of business" test, *see, e.g.,* Herbert, *The Trustee Versus the Trade Creditor: A Critique of Section 547(c)(1), (2), & (4) of the Bankruptcy Code,* 17 U.Rich.L.Rev. 667, 692 (1983) (discussing whether standard should be objective or subjective); 2 *Norton Bankr.L. & Prac.* § 32.19, at 55 (1981), existing case law makes it clear that the term "ordinary" contemplates, at least in part, that which is ordinary as between the respective parties. *See In re Top Sport Distributors, Inc.,* 41 B.R. 235 (Bkrtcy.S.D.Fla.1984); *Matter of Craig Oil Co.,* 31 B.R. 402 (Bkrtcy.M.D.Ga. 1983); *In re Williams,* 5 B.R. 706 (Bkrtcy. S.D.Ohio 1980). Both Plaintiff and Defendant have implicitly indicated support for this interpretation through their arguments. I am unwilling to deviate from such a common sense interpretation of the statute. Consequently, it will be necessary to view each transfer in the context of the parties' past course of dealing.

■ Defendant first asserts that Plaintiff's July 24, 1980, payment of $196,291.71 was consistent with the parties' course of business and in accord with ordinary business terms as reflected in their payment record.[11] Defendant argues that despite the written agreement's payment provision specifying payment deadlines of the 15th and 25th of each month, the parties established a practice of making payments one or two days late. Testimony at trial indicated that, prior to the July 24 transfer, payments had become increasingly late. Defendant failed to establish, however, that such increasingly late payments included, as a matter of course, payments made a full nine days after the due date specified in the agreement. At best, the acceptance of Plaintiff's July 24 payment constituted an extension of credit by Defendant of approximately seven days outside the parties' established practice of making and accepting payments one or two days after their official due date.[12]

■ In addition to Defendant's extension of credit, as a result of Plaintiff's check being returned to Defendant for nonsufficient funds, the July 24, 1980, payment by redepositing the check was not made in the parties' ordinary course of business. Plaintiff and Defendant established a course of business of making payments on their debts through check transfers. Prior to 1980, Plaintiff had never submitted payment in the form of an NSF check. Moreover, while there was some evidence indicating that payment by NSF check might

11. The parties stipulated that the July 24, 1980, transfer was in payment of a debt incurred in the ordinary course of business pursuant to 11 U.S.C. § 547(c)(2)(A).

12. It is unnecessary to conclude, however, that the parties' practice of making late payments constituted their ordinary course of business or the ordinary business terms of their relationship, as even this interpretation fails to adequately support Defendant's contentions. Moreover, it should be noted that Defendant entered into evidence an invoice record for November 1976 to August 1980. *Defendant's Exhibit No. 24.* This record listed payments from Plaintiff as frequently being received as much as, and sometimes more than, 5 days late. The record, however, lists the July 15, 1980, payment by Plaintiff as being received on time, while both parties conceded at trial that it was not received until July 24, 1980. This inconsistency, in addition to other inconsistencies with trial testimony, lends little weight to Defendant's invoice record. Furthermore, Defendant failed to adequately explain the criteria used to define just when payment was received for purposes of such record.

have occurred on two other occasions [13] since January 1, 1980, such should not suffice to alter an already established and substantially continuing payment practice.

Defendant contends that to interpret the July 24 transfer as not in the ordinary course of business or according to ordinary business terms would be wholly contrary to the stated legislative history and purpose of 11 U.S.C. § 547(c)(2). The clear purpose of the "ordinary course of business" exception "is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." H.R.Rep. No. 595, 95th Cong., 1st Sess. 373, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6329; *see* S.Rep. No. 989, 95th Cong., 1st Sess. 88, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5874. Payment by way of extending Defendant additional credit and directing Defendant to redeposit a NSF check, however, was not in keeping with the parties' normal financial relations. It was unusual action by the debtor to which the preference section is directed.[14]

This result is not materially different to that in *Matter of Craig Oil Co., supra.* In that case, the parties made and received payments by way of corporate checks. The creditor, Marathon Oil Co., aware that the debtor was having financial difficulty with other creditors, reviewed its account with the debtor and discovered that the debtor had exceeded its credit limit. Marathon expressed its concerns to the debtor and requested some assurance of the debtor's good faith. The debtor responded by making all future payments on its account by cashier's checks. The court held that, under the circumstances of the case, payment to Marathon by cashier's check was made neither in the ordinary course of the parties' businesses nor according to their ordinary business terms. *Matter of Craig Oil Co.*, 31 B.R. at 406. Similarly, in the instant case, Plaintiff's payment by the redepositing of a NSF check on Defendant's exptension of credit was the type of preferential treatment intended to be governed by section 547 of the Bankruptcy Code.[15]

Defendant next contends that Plaintiff's August 1 and August 6, 1980, transfers in the amounts of $125,000.00 and $56,316.07 respectively should be excepted

---

**13.** As already indicated, there was contradictory evidence on the question of whether there were or were not additional NSF check payments. The Court is of the opinion that Defendant failed to establish the existence of such additional payments.

**14.** Defendant argues that an extensive showing that a transaction occurred often or regularly is not necessary to demonstrate that a transaction was ordinary. It may be true that a transaction can be ordinary and occur only occasionally. *See In re Economy Milling Co., Inc.*, 37 B.R. 914, 922 (D.S.C.1983). Such was not the case between Plaintiff and Defendant, however. The evidence indicates that the parties did not have even an occasional practice of writing bad checks whereby payment would be derived only by depositing such checks a second time. Moreover, it is difficult to conceive of an "ordinary" business practice that includes payments to a creditor by way of NSF checks. The fact that the parties' July 30, 1980, meeting was prompted in part by the circumstances surrounding the July 24 payment further suggests that such a payment method was not ordinary between the parties.

**15.** *Compare* this case and *Matter of Craig Oil Co., supra, with In re Ferguson*, 41 B.R. 118 (Bkrtcy.E.D.Va.1984). In *Ferguson* the trustee attacked as preferential a $12,499.32 transfer to the account of the creditor in full payment of sums owed by the debtor, a farmer. Noting as unusual the fact that (1) the size of the payment was larger than most other payments made by the debtor to the same creditor, and (2) the payment completely retired all outstanding indebtedness between the two parties, the court nevertheless held that the payment was made in the ordinary course of business and according to ordinary business terms. As was observed by the court in that case, however, the actual prior payment practice had been that the debtor paid what he could against the outstanding indebtedness whenever such payments could be made. Moreover, the record indicated that payments in *the amounts $5,000 and $16,000 had been made* in the previous month. Finally, the debtor's reason for paying off the balance owed was that he was closing down his pork farm business, a supplier of which had been the creditor. These facts in the aggregate materially distinguish *Ferguson* from the circumstances in the present case.

from 11 U.S.C. § 547(b). Specifically, Defendant argues that Plaintiff's splitting of payments fails to make the transaction extraordinary or abnormal. Plaintiff correctly points out, however, that prior to the August 1 and 6 transfers, no split payments had ever been made before. Furthermore, as in the case of Plaintiff's July 24 transfer, the August 1 and 6 payments were made a full seven and twelve days late respectively. Again, assuming, without deciding, that the ordinary business terms of the parties' written agreement had been altered by their practice of making and receiving payments one or two days late, at best Plaintiff was granted credit extensions in the amounts of five and ten days respectively. As a result of the splitting of payments and credit extensions, neither payment was made in the ordinary course of the parties' businesses or according to ordinary business terms.

Defendant argues that to penalize it for its own patience "necessitated by the failure of ... [Plaintiff] to promptly come up with the amount due all at once, so long as payments were eventually received within the ordinary time frame established by the parties over the years," is inequitable. *Defendant's Post-Trial Memorandum* at 6. This argument, which incorrectly presumes that both payments were received in the ordinary time frame of the parties, also presumes incorrectly that such payments will satisfy the requirements of section 547(c)(2) regardless of their form. *See Matter of Craig Oil Co., supra.* Such an interpretation would render the provisions of § 547(c)(2) substantially meaningless. Furthermore, despite the inequity which may well befall Defendant, it must be kept in mind that the purpose of the preference section is to "facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor." H.R.Rep. No.

595, 95th Cong., 1st Sess. 177–78, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6138.[16]

■ Finally, Defendant contends that Plaintiff mischaracterizes the August 5–22 C.O.D. transfers totaling $331,000.00. According to Defendant, Plaintiff's C.O.D. payments during that period should be applied to all August milk shipments, including shipments from August 1 to August 4. Under such an analysis, Defendant argues that the entire $331,000.00 constituted a substantially contemporaneous exchange for new value given to Plaintiff. Although Defendant did in fact record the August payments on its invoice as if such payments were for all August shipments, the evidence clearly establishes that such treatment was not consistent with the true intent of the parties. The payment amounts were determined by Defendant by estimating the value of the quantities of milk requested by Plaintiff during the C.O.D. period. As these amounts were based in part on the previous month's butterfat rate and had to be later adjusted, Defendant's computations were in excess of the actual value of the milk shipped to the extent of $34,630.00. The evidence indicates that the parties never intended to apply this overpayment to the $47,150 of milk shipped from August 1 to August 4. Consequently, there was no substantially contemporaneous exchange pursuant to § 547(c)(1). *See In re Saco Local Development Corp.,* 30 B.R. 859 (Bkrtcy.D.Me.1983); *In re Hersman,* 20 B.R. 569 (Bkrtcy.N.D.Ohio 1982); *In re T.I. Swartz Clothiers, Inc.,* 15 B.R. 590 (Bkrtcy.E.D.Va.1981).

Due to the C.O.D. relationship between the parties as of August 5, 1980, it is clear that the August 5–22 transfers totaling $331,000.00 were not made in the ordinary

---

**16.** With respect to the hardship and inequity to preferred creditors in an action under § 547, one court has remarked:

> It has never been contended that preference recovery is fair to the preferred creditor; it is those creditors which did not receive payment within the preference period that are aided by a preference recovery action. Further, the

creditor's good faith and lack of knowledge of the debtor's insolvency are no longer defenses to this type of action.

*In re Anders,* 20 B.R. 468, 469 (Bankr.M.D.Fla. 1982); *see In re Saco Local Development Corp.,* 25 B.R. 876, 880 (Bkrtcy.D.Me.1982) (quoting *In re Anders, supra* ).

course of the parties' business or according to ordinary business terms. As the parties have stipulated that $296,370.00 of the relevant transfers may be excepted from § 547(b) as a substantially contemporaneous exchange, only the amount in excess is governed by that section. Consequently, the Plaintiff may avoid $34,630.00 of the August 5–22 C.O.D. transfers.

In its counterclaim, Defendant seeks an offset in the amount of $39,000.00, allegedly equal to that which it is entitled to under Plaintiff's Plan of Reorganization. In its reply, however, Plaintiff disputed the $39,000.00 amount and put Defendant to its strict proof thereof. No offering of proof was made at trial as to the proper amount to be offset, nor am I able to determine such amount due under the plan on Defendant's unsecured claim. Accordingly, Defendant's request for an offset must be denied.

### ORDER FOR JUDGMENT

THEREFORE, IT IS HEREBY ORDERED that:

1. Pursuant to 11 U.S.C. § 547(b), Plaintiff is entitled to avoid:

(a) the July 24, 1980, transfer in the amount of $196,291.71;

(b) the August 1, 1980 transfer in the amount of $125,000.00;

(c) the August 6, 1980, transfer in the amount of $56,316.07; and

(d) $34,630.00 of the $331,000.00 transferred from August 5 to August 22, 1980.

2. Defendant's request for an offset in the amount of $39,000.00 is denied.

3. Defendant's request for costs, disbursements, and attorneys' fees is denied.