In re HANCOCK–NELSON MERCAN-
TILE COMPANY, INC., Debtor.

Michael J. IANNACONE, as Trustee for
the Bankruptcy Estate of Hancock–Nel-
son Mercantile Company, Inc., Plain-
tiff,

v.

KLEMENT SAUSAGE COMPANY,
INC., Defendant.

Bankruptcy No. 3–86–256.

Adv. No. 3–86–282.

United States Bankruptcy Court,
D. Minnesota,
Third Division.

Jan. 15, 1991.

David R. Marshall, Fredrikson & Byron,
P.A., Minneapolis, Minn., for plaintiff.

Andrew N. Herbach, Howard, Peterman,
Solochek, Nashban & Weber, S.C., Milwau-
kee, for defendant.

GREGORY F. KISHEL, Bankruptcy
Judge.

This adversary proceeding for avoidance
of allegedly-preferential transfers came on
before the Court on March 7, 1989, for
trial. Plaintiff appeared by his attorney,
David R. Marshall. Defendant appeared
by its attorney, Andrew N. Herbach. Upon
the evidence adduced at trial, the briefs
and argument of counsel, and all of the
other files, records, and proceedings herein,
the Court makes the following Findings of
Fact, Conclusions of Law, and Order for
Judgment.

### FINDINGS OF FACT

Debtor was placed into bankruptcy via
an involuntary petition under Chapter 7,
filed on January 29, 1986. Immediately
after that filing, Debtor voluntarily con-
verted to the case to one for reorganization
under Chapter 11. On January 8, 1988,
this Court converted the case to one under

Chapter 7. Debtor commenced this adversary proceeding while it was still a Chapter 11 debtor in possession; the present named plaintiff is the Trustee of Debtor's Chapter 7 estate.

Debtor was a large St. Paul-based regional grocery wholesaler. It was formed in a consolidation of four smaller related companies, effected during a "leveraged buyout" in early 1985. As a result of the debt-service demands of the lenders which had financed the leveraged buyout, Debtor started to experience financial distress in May, 1985. Its fiscal difficulties quickly mounted during that summer. The lenders' enforcement of their secured positions drew off so much of Debtor's cashflow that it was unable to replenish inventory at levels necessary to meet its customers' orders; as a result, during the summer and fall of 1985 Debtor lost all of its chain-store clients. The lenders' payment demands and the drop in Debtor's sales volume had a synergistic effect, ultimately causing the bankruptcy filing and Debtor's later termination of operations in mid–1986.[1]

In the fall of 1985, management from Debtor's parent company met with representatives of its individual supplier-vendors and agents of various supplier trade groups. Management's goal was to work out credit terms and other arrangements under which Debtor could ensure its sources of supply, so it could remain in business. Debtor was never able to reach the comprehensive agreement which it sought; certain of its vendors placed it on very strict terms of payment for their invoices, some of them ceased doing business with Debtor entirely, and others continued to ship inventory on their previous terms.

Earlier in 1985, Debtor's new management had put its accounts-payable processing onto a computerized system, under which its company computer generated checks on all payables as Debtor's office staff received and entered vendor invoices. During the summer of 1985, management adopted a strange internal control under which Debtor continued to issue such checks upon its receipt of invoices, but its clerks held them back from the vendors until Debtor's parent company and the secured lenders authorized their release in accordance with a "relending formula" they had adopted.[2] At no point between May 1985 and the commencement of Debtor's bankruptcy case did any of its operating divisions actually bring all of their vendor accounts payable into current status.

Defendant is a Milwaukee, Wisconsin business concern which supplied processed meat products to Debtor. During the month of October 1985, Defendant shipped inventory to one or more of Debtor's operating divisions under four different invoices. The inventory sales and invoices are summarized as follows:

| Invoice No. | Invoice Amount | Invoice Date (and Date of Shipment) |
|---|---|---|
| 84600 | $ 3,944.00 | 10/07/85 |
| 85627 | 10,120.56 | 10/10/85 |
| 88175 | 8,882.52 | 10/24/85 |
| 89878 | 18,964.80 | 10/31/85 |

The stated terms of these invoices were "net weekly," which comported with the standard in the processed-meat sector of the grocery distribution industry.

During a corresponding period of time, Debtor issued and sent the following checks to Defendant:

---

1. The events surrounding the leveraged buyout and the ensuing collection activity by the secured creditors were the subject of a major fraudulent conveyance action against the creditors and Debtor's former corporate shareholder. *See In re Hancock–Nelson Mercantile Co., Inc.,* 95 B.R. 982 (Bankr.D.Minn.1989). That action was settled in the fall of 1989.

2. At some point in October or November 1985, Debtor's management and the lenders abandoned this procedure.

| Check No. | Check Amount | Check Date | Date Check Cleared |
|-----------|--------------|------------|--------------------|
| 109210 | $ 3,814.40 | 10/17/85 | 11/01/85 |
| 12878 | 10,120.56 | 11/04/85 | 11/16/85 |
| 1773 | 27,575.24 [3] | 11/13/85 | 11/18/85 |

As the raw data for the invoices and checks would indicate, Debtor issued all of these checks and forwarded them to Defendant after the stated due dates on the corresponding invoices. Debtor's drawee-bank also honored them on dates which were yet later than these due dates. The parties have stipulated that Defendant invoiced and shipped the goods noted on invoice no. 89878 after it received Debtor's check no. 109210.

The evidence establishes that, during the months of August and September 1985, Defendant had received checks from Debtor in payment of net-weekly invoices, on dates which ranged from 14 to 30 days after Defendant's shipment of goods and issuance of invoices. This pattern of late payment apparently had started at some point before August 1, 1985,[4] but there is no evidence as to when.

On August 5, 1985, Defendant's credit manager unilaterally imposed c.o.d. terms on an invoice for an order from Debtor, which Defendant shipped later that day. This was the first time which Defendant had done this for an order from Debtor. It did so again, for three orders shipped in late September and October 1985. These orders were interspersed among other orders shipped on net-weekly payment terms. During this period, Defendant's credit manager alternated in her discretion between assigning c.o.d. and net-weekly terms to invoices to Debtor; she apparently did so after evaluating whether Debtor's current outstanding account was too large and delinquent or not, considering the pattern of Debtor's past payments.

After November 1, 1985, Defendant placed Debtor on a c.o.d. basis for all further orders. It did this at Debtor's request, though Defendant already had refused to ship to Debtor on any other basis because of the high level of Debtor's unpaid account.

Other than the unilateral alternation of payment terms during September and October 1985, none of Defendant's employees took any other action to put pressure on Debtor to bring its account current; Defendant did not assess any late-payment penalty, interest, or service charges on Debtor's account; no one requested a meeting to discuss terms of payment and future credit; Defendant never threatened suit against Debtor; and, at least until November 1985, Defendant never refused shipment of goods to Debtor, or threatened to cut off shipment, to get it to bring its account current.

The grocery distribution trade is a high-volume, low-margin business. As such, all levels in the trade rely upon prompt payment of customer accounts on invoice to sustain their cashflow and to maintain profitability. As Debtor's president testified from his own extensive experience, during the times relevant to this adversary proceeding most large grocery chains and their wholesaling operations rarely, if ever,

3. Obviously, check no. 109210 was issued in light of the issuance of invoice no. 84600, and check no. 1773 was issued in light of the issuance of invoices nos. 88175 and 89878, even though the amounts of the checks were something less than the face amount on the invoices. The record does not reveal an explanation for the deficiency. Debtor may have returned some processed-meat inventory to Defendant and taken a credit against the invoice. On the other hand, Debtor simply may have decided to take a "discount" on the invoice on a unilateral basis, without a stated reason. Evidence received in other proceedings in Debtor's bankruptcy case suggests that this practice is not uncommon in the grocery trade. The discrepancy is not material to the ultimate issue.

4. The Court has inferred this, as Defendant's credit manager testified that it was her practice to put customers on a c.o.d. basis if they showed a pattern of failing to timely pay net-weekly invoices. Defendant did not introduce any evidence of such a pattern of late payment for any period predating August 1, 1985.

satisfied their accounts payable outside of the invoice terms. While Defendant's credit manager did attest to the fact that others among its customers consistently "paid" outside the terms of their invoices, she qualified this by stating that this generally resulted from delays in the customers' offices in processing the invoices. She acknowledged that she was prompted to switch Debtor between a net-weekly and a c.o.d. payment schedule after August 1985 because Debtor had paid beyond its "normal schedule" for several months. She testified that it was Defendant's standard practice to do this, with the decision committed mainly her discretion and that of Defendants other credit-management staff. As the uncontradicted testimony of Debtor's president established, however, none of Debtor's many other vendors and suppliers had ever switched their invoiced payment terms without advance notice.

## CONCLUSIONS OF LAW

Plaintiff seeks judgment against Defendant in the sum of $28,475.35,[5] as relief pursuant to 11 U.S.C. § 550(a)[6] to avoid those pre-petition transfers by Debtor to Defendant which total that sum. Plaintiff requests this relief pursuant to 11 U.S.C. § 547(b).[7] In the parties' stipulation of facts, Defendant has acknowledged the existence of all of the elements of § 547(b). Counsel's concise, comprehensive briefs and evidentiary presentation have narrowly focused the issues: whether, as to Plain-

tiff's full prayer for relief, Defendant is entitled to the exception from avoidance of these preferential transfers under the "ordinary course of business" provision of 11 U.S.C. § 547(c)(2); and, to the extent of the sum of $3,814.40 represented by Debtor's check no. 109210, whether Defendant is entitled to the exception from avoidance under the "new value" exception of 11 U.S.C. § 547(c)(4). Defendant has the burden of proof on both of these exceptions. 11 U.S.C. § 547(g); *In re Ewald Bros., Inc.,* 45 B.R. 52, 56 (Bankr.D.Minn.1984).

### I. § 547(c)(2) Exception: "Ordinary Course" Transfer.

As its primary defense to Plaintiff's avoidance remedy, Defendant argues that all three of these transfers are properly subject to the exception from the trustee's avoidance powers which is provided by 11 U.S.C. § 547(c)(2):

(c) The trustee may not avoid under this section a transfer—

.     .     .     .     .

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

5. The parties have stipulated that four shipments by Defendant in October 1985 on c.o.d. invoices were made contemporaneously with the tender of checks in amounts corresponding to previous net-weekly invoices. The total value of these invoices was $13,034.85. The parties have stipulated that these shipments represent exchanges for new value in the stipulated amount, and that Defendant has a valid defense under 11 U.S.C. §§ 547(c)(1) or 547(c)(4) to Plaintiff's original prayer for relief, to the extent of that stipulated "new value." Thus, Plaintiff has voluntarily reduced his prayer for judgment from the original requested amount of $41,-510.20.

6. That statute provides, in pertinent part: "to the extent that a transfer is avoided under section ... 547 ... of [the Bankruptcy Code], the Trustee may recover, for the benefit of the estate, the property transferred, or, if the Court so orders, the value of such property ..."

7. In pertinent part, the statute provides:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition;

... [and]

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

(C) made according to ordinary business terms;

The legislative history for this provision indicates:

> The purpose of this exception is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.

H.R.REP. No. 595, 95th Cong. 1st Sess. 373 (1977); S.REP. No. 989, 95th Cong.2d Sess. 88 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5874, 6329.

Since it was put into its present form by the Bankruptcy Amendments and Federal Judgeship Act of 1984,[8] § 547(c)(2) has generated more published opinions, and has probably generated more controversy, than any other aspect of the law of preferential transfers.[9]

The courts have uniformly agreed that § 547(c)(2) creates a "safe harbor" from preference attack for certain sorts of payments made by debtors on account of antecedent debt in favor of trade suppliers and other such "ordinary course" creditors. *See, e.g., In re Craig Oil Co.,* 785 F.2d 1563, 1567 (11th Cir.1986); *In re Bourgeois,* 58 B.R. at 659. This exception is designed to protect the sort of "normal," recurring transactions with trade creditors that characterize most industries. *In re Colonial Discount Corp.,* 807 F.2d 594, 600 (7th Cir.1986). In enacting § 547(c)(2), Congress ultimately intended to prevent the possibility of avoidance at the instance of a bankruptcy trustee from being a disincentive to the extension of short-term trade credit to financially-distressed debtors. *See, e.g., In re Craig Oil Co.,* 785 F.2d 1563, 1567 (11th Cir.1986); *In re Southern Commodity Corp.,* 78 B.R. 626, 682 (Bankr.S.D.Fla.1987); *In re Morris,* 53 B.R. 190, 192 (Bankr.D.Ore.1985).

The courts, however, have struggled to frame a definition for the sort of transaction which is subject to the § 547(c)(2) exception. Two different tests have emerged.

The courts adopting the first, which may be termed a "course-of-dealings" test,[10] have based their analysis almost exclusively on considerations prompted by the elements of §§ 547(c)(2)(A) and 547(c)(2)(B). Under this analysis, if the debtor incurred the debt in a fashion, and for purposes, which were within the normal range of its business operations as they were historically constituted, and then paid the debt in a manner consistent with the parties' prior

---

**8.** Section 462(c) of the 1984 Amendments Act, Pub.L. No. 98–353, § 462(c), 98 Stat. 333, 378 (1984), deleted prior § 547(c)(2)(B), which had required the defending creditor to show that the transfer was "made not later than 45 days after such debt was incurred."

**9.** The deletion of the 45–day proximity requirement seems to have been motivated by a desire to avoid an artificial cutoff of the § 547(c)(2) defense; it seems that Congress perceived the 45–day provision to have been an unnecessarily rigid criterion which did not recognize variations in trade cycles among different industries. *See* 130 Cong.Rec. S 8887, 8897 (June 19, 1984) (remarks of Sens. DeConcini and Dole); *In re Bourgeois,* 58 B.R. 657, 659 (Bankr.W.D.La. 1986). Under the pre–1984 law, the preponderance of published § 547(c)(2) decisions treated only the issue of the date on which the subject debt was incurred, to calculate the scope of the 45–day period. *See, e.g., In re Iowa Premium Serv. Co.,* 695 F.2d 1109 (8th Cir.1982); *In re Keeling,* 11 B.R. 361 (Bankr.D.Minn.1981); *In re Emerald Oil Co.,* 695 F.2d 833 (5th Cir.1983). Even under the prior law, a § 547(c)(2) determination was largely driven by the individual facts of each adversary proceeding and the specific circumstances of the credit history of each debtor and its supplier-creditors. *In re First Software Corp.,* 81 B.R. 211, 213 (Bankr.D.Mass. 1988.) The 1984 amendment made it even more so; if the blossoming numbers of the reported decisions are any indication, the amendment has actually encouraged litigiousness in the preference arena rather than decreased it. *See also In re Bourgeois,* 58 B.R. at 658.

**10.** In one of the more frequently-cited decisions applying § 547(c)(2), the court termed this test the "majority" approach. *See In re Steel Improvement Co.,* 79 B.R. 681, 683–84 (Bankr.E.D. Mich.1987). *See also In re Unimet Corp.,* 85 B.R. 450, 453 (Bankr.N.D.Ohio 1988). A strict head-count of decisions extant at the time supports this characterization. Since then, enough other courts have adopted the alternate test that the characterization is no longer correct. *See In re Loretto Winery, Ltd.,* 107 B.R. 707, 710 (Bankr.9th Cir.1989) (characterizing the alternate rule as the "majority" rule). The court in *Steel Improvement Co.* itself adopted the then-"minority" rule.

course of dealing, the transfer is considered to be "in the ordinary course," and is excepted from avoidance. *See, e.g., In re Jerry–Sue Fashions, Inc.*, 91 B.R. 1006 (Bankr.S.D.Fla.1988); *In re First Software Corp.*, 81 B.R. 211 (Bankr.D.Mass.1988); *In re Sunup/Sundown Inc.*, 66 B.R. 1021 (Bankr.S.D.Fla.1986); *In re Decor Noel Corp.*, 65 B.R. 707 (Bankr.W.D.Tenn.1985); *In re White*, 64 B.R. 843 (Bankr.E.D.Tenn. 1986); *In re White*, 58 B.R. 266 (Bankr.E. D.Tenn.1986); *In re Ferguson*, 41 B.R. 118 (Bankr.E.D.Va.1984); *In re Mindy's, Inc.*, 17 B.R. 177 (Bankr.S.D.Ohio 1982).

For this reason, this test is sometimes called the "subjective" test; the focus is on the idiosyncratic aspects of the two parties' past relationship, and the outcome of the preference action is controlled by the subject transaction's conformity with the past patterns of that relationship. To the extent that these courts have even acknowledged the existence of the third element of § 547(c)(2)(C), they have concluded that the "ordinary business terms" with which the transfer must comport were those established *by the parties* in the course of their prior financial relationship. *See, e.g., In re White*, 58 B.R. 266 (Bankr.E.D.Tenn.1986).

The courts which have enunciated and adopted the second, or "industry-practices," [11] test have done so based on their recognition that the three requirements of § 547(c)(2) are conjunctive, and are not exclusive of one another. *See, e.g., In re Cleveland Graphic Reproduction, Inc.*, 78 B.R. 819, 822 (Bankr.N.D.Ohio 1987); *In re Bourgeois*, 58 B.R. at 658. These courts fully acknowledge that §§ 547(c)(2)(A) and 547(c)(2)(B) contemplate a "subjective" comparison of the similarity of the challenged transaction to the parties' own established course of dealing. However, they criticize the "subjective" test for effectively subsuming the element of § 547(c)(2)(C) into the first two elements, and note that it allows a defendant to satisfy § 547(c)(2)(C) with proof identical to that going to the first two elements. *In re Loretto Winery, Ltd.*, 107 B.R. at 709; *In re Unimet Corp.*, 85 B.R. at 453. As these

courts reason, the "course of dealings" test essentially makes § 547(c)(2)(C) either a nullity or a superfluity, contrary to the canons of statutory construction. *In re Loretto Winery, Ltd.*, 107 B.R. at 709; *In re Steel Improvement Company*, 79 B.R. at 683.

The courts adopting the alternate test essentially incorporate the "subjective" analysis of the "course of dealings" test for their application of §§ 547(c)(2)(A) and (B), by inquiring whether the transaction was "ordinary as between the parties," considering the past history of their accounts. *In re Production Steel, Inc.*, 54 B.R. 417, 423 (Bankr.M.D.Tenn.1985). *See also In re Loretto Winery, Ltd.*, 107 B.R. at 709; *In re Magic Circle Energy Corp.*, 64 B.R. 269, 272 (Bankr.W.D.Okla.1986). They go on to hold that the reference to "ordinary business terms" in § 547(c)(2)(C) requires the court to consider the parties' adherence to standard practice among similarly-situated businesses, as to the manner and timing of payments on ordinary trade credit. Under this third element, the parties' past course of dealing is irrelevant; if the manner and timing of a payment challenged as preferential deviate from norms in the parties' industry, the exception from avoidance is not available. *In re Loretto Winery, Ltd.*, 107 B.R. at 709; *In re Unimet Corp.*, 85 B.R. at 453; *In re Steel Improvement Co.*, 79 B.R. at 684; *In re Magic Circle Energy Corp.*, 64 B.R. at 272; *In re Production Steel, Inc.*, 54 B.R. at 423.

The "industry practices" test comports more with the expression of congressional intent on the face of the statute, and is the more rational, balanced, and principled of the two tests. In according some deference to the parties' course of dealing, it avoids the draconian result which might otherwise obtain from giving conclusive effect to due dates on printed invoice forms, where a trade vendor has not itself enforced them in its past dealings with the debtor. However, in imposing the overlay of an "objective" inquiry into industry

---

**11.** Because the test involves inquiries of two different natures and scopes, it would not be inaccurate to term it a "subjective-objective" test. The resultant oxymoron, however, is unnecessarily confusing.

practice, it furthers the primary goal of preference relief:

> Equality of distribution among creditors is a central policy of the Bankruptcy Code. According to that policy, creditors of equal priority should receive pro rata shares of the debtor's property. [citations omitted] Section 547(b) furthers this policy by permitting a trustee in bankruptcy to avoid certain preferential payments made before the debtor files for bankruptcy. This mechanism prevents the debtor from favoring one creditor over others by transferring property shortly before filing for bankruptcy.

*Begier v. I.R.S.,* —— U.S. ——, ——, 110 S.Ct. 2258, 2262–63, 110 L.Ed.2d 46 (1990). *See also In re Ewald Bros., Inc.,* 45 B.R. at 52 (citing H.R.REP. No. 595, 95th Cong., 1st Sess. 177–78 (1977), for proposition that "the purpose of the preference section is to 'facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor' ").

In the debt structure of any commercial bankruptcy case with multiple vendor claims against the estate, one will be faced with the situation of some vendors which adhered to industry norms for billing and collection practices in their dealings with the debtor, and some which did not. The trade practices for all vendors of a particular debtor are likely to be the same or substantially similar, as they will all be operating in the same industry, or in related industries. In the months immediately preceding bankruptcy, the debtor may pay some of its vendors in a fashion which otherwise materially differs from the customary industry pattern for the turnaround of invoiced orders, and may not give like treatment to other vendors, leaving them with long-overdue receivables.

In the meantime, of course, the debtor is on a downward financial spiral which eventually leads to bankruptcy; it is generally accruing payables, which will become claims against the estate to the extent they remain unpaid as of the bankruptcy filing. If, as with Debtor's case, the roots of its financial distress are all-pervasive, it will not have either the resources or the focused attention to develop a consistent prepetition treatment of its payables. Instead, it will make accommodations in payment to those vendors who are most insistent, or whose products or services it deems most vital to its continued operations, and will hold off the others.

Thus, where all of a debtor's payables are delinquent, late payments may constitute a preferential accommodation even if the recipient is not receiving the benefit of timely payment, or complete payment; relative to others whose claims survive as unpaid into the bankruptcy case, the recipient has received a benefit which, if preserved, will tend to defeat equality of treatment in the case. It cannot be denied that overlaying an "objective" standard will lessen the availability of the § 547(c)(2) exception; in part, it does so by permitting the avoidance of the transfer where, as here, the deviation from industry norms via the sufferance of untimely payment actually benefitted the debtor rather than the creditor-recipient. However, the overlay substantially contributes to the statutory goal of leveling the field among all creditors, by subjecting all of them to the same ultimate treatment in the bankruptcy case notwithstanding the debtor's individual, pre-petition accommodations with some of them. *See In re Xonics Imaging Inc.,* 837 F.2d 763, 767 (7th Cir.1988); *In re Craig Oil Co.,* 785 F.2d at 1567; *In re Cleveland Graphic Reproduction, Inc.,* 78 B.R. at 823; *In re Southern Commodity Corp.,* 78 B.R. at 628; *In re Ewald Bros., Inc.,* 45 B.R. at 56 (all noting particular relevance of lateness in payment to ordinary-course determination under § 547(c)(2)).

When this combined test is applied to the facts at bar, it is clear that Defendant has proven no more than one of the three elements of § 547(c)(2)—the first one. There is no question that Debtor incurred the debts evidenced by the invoices in question in the ordinary course of Defendant's and its own business. Defendant was a grocery producer and supplier, and Debtor a grocery wholesaler; short-term credit resulting from invoiced shipments of goods is the predominant, and probably the exclusive, form of ongoing credit furnished by vendors in the grocery distribution industry. Debtor issued all three of the checks

in question in payment of these invoiced extensions of credit. Defendant has, therefore, satisfied § 547(c)(2)(A).

However, it has not proven either of the remaining elements.

First, it has not demonstrated that these payments fell within a range of currency established by the parties' past dealings, *over a time during which the "baseline" course of conduct contemplated by § 547(c)(2)(B) is appropriately measured.* The only evidence on this issue which Defendant brought forward was for a period of approximately 60 days prior to the commencement of the 90–day period. During this 60–day period, Debtor was already experiencing fatal financial distress. The major portion of its cashflow was being diverted to its secured lenders' demands; it was falling further and further behind on its vendor payables throughout the summer and fall of 1985. More than anything else, this stress was evidenced by the internal control which management applied to Debtor's new payable processing program, at the behest of the secured lenders. The control tenuously preserved an accounting fiction that Debtor was maintaining currency on its payables, but in truth it was designed to facilitate the shuffling of Debtor's dwindling cashflow among the demands of its many vendors only after the much larger demands of the secured lenders were met.

■■■ There is real doubt whether a preference defendant can properly rely upon experience of no more than two months in duration prior to the commencement of the preference period to establish the "ordinary course" of the parties' past dealings. Among the factors which the court must consider in determining course of dealings is the length of the parties' financial relationship. *In re Richardson,* 94 B.R. 56, 60 (Bankr.E.D.Pa.1988). The obvious corollary to this point is that the entire length of the relationship, or at least a material segment of it, should be examined to determine the "baseline" course of dealings.

The goal of the inquiry under § 547(c)(2)(B), of course, is to establish a "baseline" of dealings with "reasonable,

ascertainable boundaries," *In re Loretto Winery, Ltd.,* 107 B.R. at 710; otherwise, no meaningful, accurate comparison of the subject transaction(s) can be made. The only way in which § 547(c)(2)(B) can have a truly normative function is by establishing a "baseline" of dealings, fixed at least in part during a time in which the debtor's day-to-day operations were "ordinary" in the layman's sense of the word. Preferably, the material period should extend back into the time before the debtor became financially distressed, or at least before the debtor was subject to as deep a structural stress as this debtor was after the consummation of its ill-conceived leveraged buyout. A debtor subject to the throttle-hold of secured parties which have the very continuation of its existence at their behest, simply cannot be said to be operating "in the ordinary course of business." Neither can a debtor whose trade vendors have organized to confront it with their common frustrations with its financial disorganization.

The only evidence of record going to the parties' course of dealings is from the period when Debtor's downfall was foreordained—at least absent major concessions, never forthcoming, by its secured lenders. This evidence cannot support the framing of a range of relative "currency" in payment which Debtor and Defendant had mutually accepted under "normal" circumstances. It certainly does not support the conclusion that Debtor's acts in greatly deviating from invoice payment terms were tacitly accepted by the parties as a long-term practice. Defendant, thus, has failed to carry its burden on § 547(c)(2)(B), the "subjective" element of the industry practices test.

Defendant has also failed to prove that Debtor made the three payments "according to [the] ordinary business terms" then prevailing in the grocery distribution industry.

In a general sense, it could be said that, during the entire period for which evidence was introduced, Defendant and Debtor were not conforming their credit relationship to industry norms. The uncontroverted evidence as to the industry standard for

invoiced payment terms established them as a uniform "net weekly" basis; processed-meat suppliers customarily allowed short-term credit for inventory purchases by wholesalers, but conditioned it on very prompt payment in full. However, for the four months prior to and during the subject transfers, Defendant's own practice as to Debtor included the unilateral denial of such credit, but not in a uniform or consistent fashion. It is not inconceivable that industry practice would have supported Defendant in switching a customer with a large account balance over to a c.o.d. basis for *all* further orders, at least until the customer satisfactorily reduced the account balance; however, Defendant did not introduce evidence to indicate this. Given the narrow profit margins at each level of the grocery distribution network, it is much less likely that sound industry standards would have justified a supplier in carrying a large account balance for several months, so long as the customer satisfied scattered c.o.d. invoices issued in warning, and paid other, more standard ones on a fairly timely basis. Regardless of the relative likelihood that Defendant's credit manager was acting in accord with industry practice in switching invoice terms on Debtors, however, Defendant again failed to make an evidentiary record to defend those actions. Beyond the lack of evidence going to the acceptability of the tactic, there was no evidence to establish the objective guidelines for account balance and/or currency under which a credit manager would employ the tactic. In the absence of such evidence, the events portray nothing more than a supplier which had allowed itself to get caught with an unacceptably large receivable, and which was doing anything and everything it could to extract as much payment as possible. It does *not* establish a course of transactions consciously structured in advance to conform to an external, objective norm.

To a large extent, however, discussion of the conformity of a past pattern of dealings to general industry norms is irrelevant; after all, the statute only contemplates whether *the subject transactions* were made "according to ordinary business terms." Even if the § 547(c)(2)(C) inquiry is limited to the issuance and payment of the three checks, however, it is clear that these transfers were outside industry norms.

Debtor issued its checks on dates between three and eighteen days after the stated due dates on the invoices; Defendant received those checks on some unknown dates after their issuance, and two out of the three of them cleared twelve and fifteen days, respectively, after their date of issuance.[12] This pattern of late payment did not comport with practice in the regional or national industry.

Industry practice in the extension of trade credit, of course, evolves in response to the realities of regional and national markets, cycles in the availability of supplies and materials, and participants' debt and asset structures, financial liquidity, and other economic factors. The grocery distribution industry, running on as low a profit margin as it does, is absolutely dependent upon an extremely quick turnaround of inventory and payables, to maintain business volume and to ensure profitability. Defendant's own evidence circumstantially bears out this observation; during and after early August 1985, it is quite unlikely that Defendant's credit manager would have taken the extraordinary actions she did, had Debtor's performance in payment fallen within a range of currency generally accepted in the industry. The only probative, on-point evidence going to industry standards on currency of payment establishes that Debtor violated them. It paid all of the subject invoices at intervals which, though not lengthy in terms of the lapse of calendar time, nonetheless ranged anywhere from something more than half again as long, to more than three times longer than, those contemplated by either Defendant's invoices or industry practice.[13]

---

**12.** This circumstance suggests that Debtor held back the first two checks pursuant to its later-abandoned internal control system.

**13.** This observation is correct whether, for the purposes of applying § 547(c)(2), one considers the date of the transfer as being the date of the debtor's tender of the check, or as the date on which the debtor's drawee-bank honors the check. It is settled in this District that the latter date is the date of transfer for the purposes of

Given the time-sensitive nature of trade credit in the industry, these lapses were material, and of such duration that they were substantially out of conformance with industry standards.

Defendant has not produced any evidence to establish the industry standards to which, it asserts, these transfers conformed; thus, Defendant has also failed to carry its burden on § 547(c)(2)(C), the "objective" element of the industry practices test. *See In re Steel Improvement Co.*, 79 B.R. at 683; *In re Production Steel, Inc.*, 54 B.R. at 423–24.[14] Defendant had the burden of proving all of the elements of § 547(c)(2) to avail itself of the exception. *In re Donny*, 11 B.R. 451, 452 (Bankr.W.D. Wis.1981). It did not do so, and as a result it is not entitled to this affirmative defense to Plaintiff's preference claim.

## II. § 547(c)(4) Exception: "Subsequent Advance of New Value" Offset.

As a secondary, partial defense to Plaintiff's avoidance remedy, Defendant argues that the transfer of the sum of $3,814.40, as evidenced by Debtor's check No. 109210, is subject to the exception from the trustee's avoidance powers which is provided by 11 U.S.C. § 547(c)(4):

(c) The trustee may not avoid under this section a transfer—

.    .    .    .    .

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor;

The legislative history for this provision states:

The fourth exception codifies the net-result rule in section 60c of current law.[15] If the creditor and the debtor have more that one exchange during the 90–day period, the exchanges are netted out according to the formula in paragraph (4). Any new value that the creditor advances must be unsecured in order for it to qualify under this exception.

H.R.REP. No. 595, 95th Cong.1st Sess. 374 (1977); S.REP. No. 989, 95th Cong., 2d Sess. 88 (1978), U.S.Code Cong. & Admin. News 1978, pp. 5874, 6330.

Several courts have noted that, strictly speaking, § 547(c)(4) does not embody a "net-result rule"; rather, it embodies a

---

applying § 547*(b)*. *See Olsen–Frankman Livestock Marketing Serv., Inc. v. Citizens Nat'l Bank,* 4 B.R. 809, 813 (D.Minn.1980); *In re Bellanca Aircraft Corp.,* 56 B.R. 339, 382 (Bankr.D.Minn. 1985), *rev'd in part on other grounds,* 850 F.2d 1275 (8th Cir.1987); *In re Ramy Seed Co.,* 57 B.R. 425, 429 (Bankr.D.Minn.1985). The legislative history suggests a different standard for the application of the § 547(c) exceptions. *See* H.R.REP. No. 595, 95th Cong., 1st Sess. 373–74 (1977); S.REP. No. 989, 95th Cong. 2d Sess. 88 (1978). As a result, the courts have disagreed as to the date of the subject transfer when treating defenses under § 547(c). *See discussion in In re Bellanca Aircraft Corp.,* 56 B.R. at 397–8, *inter alia.* Neither the District Court for this District nor the Eighth Circuit has ruled on the question. *See In re Bellanca Aircraft Corp.,* 850 F.2d at 1283–84 (finding it unnecessary to rule on the question to dispose of the issues before it, and declining to do so). As the facts are here, the substantial tardiness of Debtor's payments is established, whether one considers the earlier event or the later as the act of transfer for § 547(c) purposes. There is no evidence as to when Debtor actually tendered or delivered any

of the checks to Defendant, but it can be safely inferred that delivery took place at least two or three days after issuance. Thus, this proceeding does not call for a binding ruling as to which event was the transfer for the purposes of § 547(c)(2).

**14.** While Defendant's credit manager testified that others among its customers paid consistently outside their invoice terms, this conclusory, vague statement did not go to whether this practice was acceptable or "normal" within the industry, and it certainly did not suggest any sort of rule or standard.

**15.** This provision, part of the Bankruptcy Act of 1898, read:

If a creditor has been preferred, and afterward in good faith gives the debtor further credit without security of any kind for property which becomes a part of the debtor's estate, the amount of such new credit remaining unpaid at the time of the adjudication in bankruptcy may be set off against the amount which would otherwise be recoverable from him.

"subsequent-advance rule" which protects a transfer to a creditor from preference attack to the extent that the creditor *thereafter* provides credit on an unsecured basis for the debtor's purchase of goods or services. *See, e.g., In re Fulghum Constr. Corp.,* 706 F.2d 171, 173–74 (6th Cir.1983); *Leathers v. Prime Leather Finishes Co.,* 40 B.R. 248, 150 (D.Me.1984). *See also discussion in* 4 COLLIER ON BANKR para. 547.12, at 547–56 to 547–58 (15th ed. 1990).

■ The exception is designed to accord fair treatment to creditors which replenish the debtor's operation, after receiving a preferential transfer. *In re Bellanca Aircraft Corp.,* 850 F.2d at 1280; *In re American Int'l Airways, Inc.,* 56 B.R. 551, 553 (Bankr.E.D.Pa.1986). Its purpose "is precisely to encourage trade creditors to continue dealing with troubled businesses." *In re Gold Coast Seed Co.,* 30 B.R. 551, 553 (Bankr. 9th Cir.BAP 1983). *See also In re Bellanca Aircraft Co., Inc.,* 56 B.R. at 393 ("The clear intent of Congress is that new value advanced by creditors should be available to debtors in the conduct of their businesses"); *In re Kroh Bros. Development Co.,* 104 B.R. 182, 188 (Bankr.W.D.Mo.1989). The required sequence of transactions—the attacked preferential transfer, followed by the advance of credit now asserted in the nature of an offset—is established by the language of the statute itself: its specific wording is "after such transfer such creditor gave new value . . . ," the referent transfer being the one subject to avoidance under § 547(b). Thus, in applying the § 547(c)(4) defense the Court may reduce the amount of the avoided preference by the amount of any extension of unsecured credit made *after* the preferential transfer, and nothing more; unpaid trade debt of the debtor to the defendant which predates the preferential transfer may not be applied to reduce the trustee's recovery. *In re Paula Saker & Co., Inc.,* 53 B.R. 630, 633 (Bankr. S.D.N.Y.1985).

■ The replenishment of the debtor's operations, however, must be attributable to an actual advance of credit, which then remains unpaid in whole or in part as of the date of the debtor's bankruptcy filing. *In*

*re Vunovich,* 74 B.R. 629, 632 (Bankr.D. Kan.1987); *In re Almarc Mfg., Inc.,* 62 B.R. 684, 686 (Bankr.N.D.Ill.1986). These cases suggest that Defendant has no viable defense under § 547(c)(4). Defendant asserts the right to offset the extension of credit evidenced by invoice no. 89878 against the preferential payment evidenced by check no 109210, to except that entire payment from avoidance. This would be well and good if the debt evidenced by invoice no. 89878 remained unpaid into Debtor's bankruptcy case. The problem is that it did not; it was paid and satisfied by the honoring of Debtor's check no. 109210.

A very few courts have held that the subsequent advance need not remain unpaid, to satisfy § 547(c)(4). *See In re Isis Foods, Inc.,* 39 B.R. 645 (W.D.Mo.1984); *In re Paula Saker & Co., Inc.; In re Kroh Bros. Development Co.,* 104 B.R. at 195. However, the great majority of courts addressing the issue have concluded that the *Isis Foods* holding "seems contrary to common sense and the clear intent of the statute." *In re Global Int'l Airways Corp.,* 80 B.R. 990, 992 at n. 4 (Bankr.W.D.Mo. 1987). *See, e.g., In re Prescott,* 805 F.2d 719 at 731 (7th Cir.1986); *In re Ford,* 98 B.R. 669, 681 (Bankr.D.Vt.1989); *In re American Int'l Airways, Inc.,* 56 B.R. at 554–55; *In re White River Corp.,* 50 B.R. 403, 409–10 (Bankr.D.Colo.1985); *In re Formed Tubes, Inc.,* 46 B.R. 645 at 646 (Bkrtcy.E.D.Mich.1985); *In re Keydata Corp.,* 37 B.R. 324, 328 (Bankr.D.Mass. 1983); *In re Bishop,* 17 B.R. 180 at 183 (Bkrtcy.N.D.Ga.1982).

The majority rule on this issue is indeed the one which makes sense. Allowing the offset of a *satisfied* subsequent advance may give lip service to the statutory goal of encouraging continued dealings with distressed businesses, but it does so at the cost of tipping the statutory balance of economic considerations over to the creditor-supplier's side. As the courts have noted, the subsequent advance contemplated by § 547(c)(4) essentially returns the value of the earlier preference to the debtor, in whole or in part. *See, e.g., In re American Int'l Airways, Inc.,* 56 B.R. at 554; *In re Formed Tubes, Inc.,* 46 B.R. at 647; *In re*

Columbia Packing Co., 44 B.R. 613, 615 (Bankr.D.Mass.1984). Where, however, the debtor later pays for the new value, that value passes back out of the debtor's operations, to the creditor-supplier; as a result, the § 547(c)(4) defense is not available to the creditor. *In re American Int'l Airways, Inc.*, 56 B.R. at 554–55. This makes every bit of sense; the subsequent advance no longer remains an unpaid receivable on the creditor-supplier's books, so there is no reason why it should get "credit" for it in the larger-scale adjustment of relationships which takes place in the avoidance of preferences.

Adopting the minority rule on this threshold issue could substantially undercut the trustee's avoidance powers and defeat the Congressional goals behind preference relief, without the factual predicate which Congress intended to be present before any § 547(c) setoff. Adopting and applying the majority rule, the Court concludes that Defendant has failed to carry its burden on the partial defense of § 547(c)(4).

### ORDER FOR JUDGMENT

On the basis of the foregoing Findings of Fact and Conclusions of Law, then,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

1. That Debtor's transfers of a total of $28,475.35 to Defendant on November 1, 16, and 18, 1985, are avoided pursuant to 11 U.S.C. § 547(b), and are preserved for the benefit of Debtor's bankruptcy estate pursuant to 11 U.S.C. § 551.

2. That, pursuant to 11 U.S.C. § 550(a), Plaintiff shall recover from Defendant the sum of $28,475.35.

LET JUDGMENT BE ENTERED ACCORDINGLY.