**In re CHECK REPORTING SERVICES, INC., Debtor.**

**James W. BOYD, Trustee, Plaintiff,**

**v.**

**THE WATER DOCTOR, Defendant.**

Bankruptcy No. SL–89–00270.
Adv. No. 91–8301.

United States Bankruptcy Court,
W.D. Michigan, S.D.

May 18, 1992.

See also, 137 B.R. 653.

Day & Sawdey (John T. Piggins, argued) Grand Rapids, Mich., for plaintiff Trustee.

DeGroot Keller & Vincent (Murray B. DeGroot, argued) Grand Rapids, Mich., for defendant The Water Doctor.

OPINION AND ORDER DENYING SUMMARY JUDGMENT IN PART AND GRANTING SUMMARY JUDGMENT IN PART

JO ANN C. STEVENSON, Bankruptcy Judge.

## I. Introduction.

The motion presently before the Court calls into question the proper interpretation of 11 U.S.C. § 547(c)(4)(B), which limits the extent to which a creditor may assert the new value defense in a preference action. 11 U.S.C. § 547(c)(4) provides that the trustee may not avoid as a preference a transfer

> to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
>
> (A) not secured by an otherwise unavoidable security interest; and
>
> (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

There appears to be no claim that an otherwise unavoidable security interest was transferred with the asserted new value as described in § 547(c)(4)(A). Thus, the Trustee's attack on Defendant The Water Doctor's ("Water Doctor") assertion of the new value defense focuses on the labyrinthine language of § 547(c)(4)(B).

The Trustee argues that the great weight of the case law supports his interpretation of this provision. The Court has carefully reviewed those cases and for the reasons which follow declines to adopt their conclusions. Rather than deciding this case based upon the number of cases supporting the two interpretations urged by the parties, the Court prefers to carefully scrutinize the precise language of the statute.[1]

## II. Facts.

The factual backdrop against which this motion arises is stereotypical of a creditor dealing with a debtor on a running account basis during the preference period. It is also stereotypical of the plethora of preference cases initiated by the Trustee in the underlying bankruptcy. Water Doctor had an agreement with the Debtor, Check Reporting Services, Inc. ("CRS") under which CRS processed charge card payments, called "sales drafts," for Water Doctor. When customers made purchases using MasterCard or Visa, the merchants would send the sales drafts to CRS which would in turn forward them for processing through the appropriate banking channels. In CRS's case the sales drafts always flowed through Comerica Bank–Detroit ("Comerica"). At some point CRS would receive payment for the sales drafts through the same channels and would forward the payment onto merchants such as Water Doctor, less its processing fee. It appears undisputed that certain identifiable payments were made by CRS to Water Doctor under this arrangement. These payments, and the transfers of "new value" which Water Doctor alleges it made to CRS in the form of sales drafts, were as follows during the preference period[2]:

| Date | Alleged Preference | New Value |
|---|---|---|
| 11/1/88 | $ 1,477.18 | |
| 11/1/88 | $ 176.91 | |
| 11/10/88 | | $ 211.02 |
| 11/15/88 | $ 934.04 | |
| 12/6/88 | | $ 2,006.24 |
| 12/9/88 | | $ 43.76 |

1. The Court must add that the excellent brief of counsel for the Water Doctor was a most helpful tool in making a determination in this case.

2. We have assumed that the "clear" dates shown by the Trustee in Exhibit A attached to the complaint were the dates of the alleged preferences. The Court has further assumed that the new value transfers asserted by Water Doctor occurred one day after the dates appearing on the vouchers attached to Water Doctor's motion. However, for the purposes of this motion, the exact dates of the transfers do not appear to be a material issue.

| Date | Alleged Preference | New Value |
|---|---|---|
| 12/12/88 | $ 211.02 | |
| 12/13/88 | $ 1,142.90 | |
| 12/14/88 | | $ 1,252.55 |
| 12/20/88 | | $ 881.13 |
| 1/6/89 | $ 2,006.24 | |
| 1/6/89 | | $ 1,142.90 |
| 1/10/89 | | $ 781.57 |

---

Although Water Doctor argues that none of the transfers from CRS were preferences, it has assumed that the transfers were preferences for the purposes of this motion. There is no such reciprocal assumption on the Trustee's part regarding the new value transfers asserted by Water Doctor. Water Doctor attached seven vouchers prepared by CRS which it asserts establish the amount of the new value transfers. During discovery Trustee admitted that these vouchers were routinely prepared by CRS the day following the electronic tender of sales drafts by the merchant, in this case Water Doctor. The Trustee has presented no affidavit or other evidence to rebut these proofs. The Trustee does however intimate that these transfers have not been established as fact:

> With regard to the Defendant's Motion, Plaintiff disputes the figures on Defendant's Exhibit 7. On that exhibit Defendant lists a column entitled "Exposure per plaintiff". Plaintiff has neither acknowledged the accuracy of this information [setting forth the amount of the new value transfers] nor that this is Defendant's exposure. To the contrary, without affirmative evidence, Plaintiff believes Defendant's exposure is the full amount demanded in his Complaint.

Trustee's Brief at 3.

At some point after the commencement of bankruptcy proceeding the MasterCard and Visa organizations began to put pressure on Comerica to resolve claims of merchants who had used CRS to process their sales drafts. Ultimately, Comerica purchased the claims of a number of merchants, including some of those held by

Water Doctor. According to the documents attached to Water Doctor's motion, these consisted of the December 20, 1988 transfer in the amount of $881.13, the January 6, 1989 transfer in the amount of $1142.90, and the January 10, 1989 transfer in the amount of $781.57.[3]

### III. Jurisdiction.

Jurisdiction exists in this matter under 28 U.S.C. § 1334(b), preference matters being core proceedings under 28 U.S.C. § 157(b)(2)(F).

### IV. Summary Judgment.

FED.R.BANKR.P. 7056 makes applicable FED.R.CIV.P. 56 in bankruptcy cases. That rule provides in part that, upon filing of a motion for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

FED.R.CIV.P. 56(c). Once the moving party has carried the burden that no genuine issue of material fact exists, the burden shifts to the nonmovant who may not rely on the pleadings but must by other evidence establish the existence of a fact issue. *Smith v. Transworld Systems, Inc.,* 953 F.2d 1025, 1028 (6th Cir.1992).

■ There is no dispute as to either the amount or date of the alleged preferential transfers. The Trustee has questioned the accuracy of Water Doctor's claims of new value, which would initially appear to raise an issue of fact. However, the vouchers

---

**3.** There appears to be no dispute between the parties that these payments by third party Comerica do not affect Water Doctor's ability to assert the new value defense. Accordingly we do not address this issue.

supplied to Water Doctor by Trustee form a reasonable basis to conclude that the new value transfers alleged by Water Doctor did in fact occur as alleged. This showing shifts the burden to the Trustee to offer some rebutting evidence, which the Trustee has failed to produce. As the time for discovery in this case has ended the Trustee has had ample opportunity to unearth the evidence necessary to challenge the existence of these transfers. The Court concludes that Trustee has failed to establish the existence of a fact issue as to the dates and amounts of the new value transfers.

## V. 11 U.S.C. § 547(c)(4)(B).

The crux of this case is the proper interpretation of § 547(c)(4)(B)'s provision that a preference defendant may assert as a defense only that new value "on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor". Although this provision has not changed since its enactment in 1978, the majority of courts subsequently construing it have failed to carefully read and properly apply its language.

### A. Interpretive Case Law.

*In the Matter of Bishop,* 17 B.R. 180 (Bankr.N.D.Ga.1982) is the focus of Water Doctor's argument regarding the proper interpretation of 11 U.S.C. § 547(c)(4)(B). Water Doctor contends that this case initially interpreted that section and is the linchpin for the majority line of decisions which followed. The transfers between the parties during the preference period in *Bishop* followed the same general pattern as those alleged in this case and are set forth below:

| Date | Alleged Preference | New Value |
|---|---|---|
| 9/27/79 | $18,418.50 | |
| 10/3/79 | | $ 9,140.80 |
| 10/4/79 | | $19,300.00 |
| 11/21/79 | | $10,000.00 |
| 11/28/79 | $ 1,828.16 | |
| 12/4/79 | $19,800.00 | |

The court interpreted this then-new provision in the context of these transfers:

> For § 547(c)(4) to apply, three requirements must be met. First, the creditor must extend new value as defined in § 547(a)(2) as "money or ... new credit" after the challenged payment. The payment which is the subject of Count III of the Amended Complaint was made on September 27, 1979. Following that date, Trust Company made three further credit extensions to Bishop on October 3rd, October 4th, and November 21st. Therefore, "new value" as defined in § 547(c)(4)(B) was extended after the payment. Secondly, the new value must be unsecured. Section 547(c)(4)(A). *Finally, the new value must go unpaid.* Section 547(c)(4)(B).

17 B.R. at 183 (emphasis supplied). The language emphasized in the quote above was the extent of the court's analysis of the proper interpretation of § 547(c)(4)(B).

The complaint in the *Bishop* case set forth the September 27 transfer of $18,418.50 as a separate count. Therefore the court first applied the exception as paraphrased above to this transfer alone. It concluded that the total amount of new value given after this transfer was $38,440.80, the sum of the October 3, October 4 and November 21 transactions. It then attempted to apply § 547(c)(4)(B), but in doing so, it did not apply the statutory language. Instead, it applied its own term, "unpaid":

> Of this amount [the $38,440.80 in new value] $21,628.16 was repaid: $1,828.16 (October 3 note) on November 28, 1979 and $19,800 (October 4 note) on December 4, 1979. The extent to which this

new value went unpaid is $16,812.64. To this extent the payment of September 27, 1979, if found preferential, may be offset.

*Id.*

■ The next issue the court addressed was whether the "net result rule" used under the Bankruptcy Act had any remaining vitality under the Code. Under the net result rule the total of new value given is subtracted from the total of the preference payments to determine the creditor's maximum exposure. The defendant argued that because the total alleged preferences exceeded the total new value given by the defendant during the preference period by $1,605.86, the trustee's recovery should be limited to this amount. The court rejected this argument based upon language in § 547(c)(4) requiring that the new value be given "after" the allegedly preferential transfer. Under the net result rule, new value could also apply to a preference given after the new value, contrary to the statutory language. That the net result rule leads to statutorily incorrect results can be simply illustrated by two hypotheticals, each setting forth two transfers during the preference period:

### Hypothetical # 1

| Date | Alleged Preference | New Value |
|---|---|---|
| 9/1/92 | $1,000.00 | |
| 10/1/92 | | $500.00 |

### Hypothetical # 2

| Date | Alleged Preference | New Value |
|---|---|---|
| 9/1/92 | | $500.00 |
| 10/1/92 | $1,000.00 | |

In both of these hypotheticals, the net result of the transfers between the parties is that the estate was diminished by $500.00, and under the net result rule the creditor's maximum preference exposure would therefore be $500.00. However, in Hypothetical # 2, the new value was given *before* the preferential transfer occurred, and therefore would not be considered for purposes of § 547(c)(4). Thus in Hypothetical # 1 the preference recovery would be $500.00, while in Hypothetical # 2 the preference recovery would be $1,000.00. As can be seen, the net result rule works under some but not all factual scenarios. This discrepancy with the language of the statute varies depending upon the number, size and order of the various transfers. Certainly, as a generally applicable principle, the net result rule does not comport with the statute. This was the holding of the *Bishop* court.

■ While the *Bishop* court's rejection of the net result rule was rooted in the statutory language, its application of § 547(c)(4)(B) was not. The error in its reasoning can be seen by examining the two transfers from the debtor which partially "paid" the defendant's new value. The statutory language consists of several layers of negatives, which are more easily understood if applied to these two transfers one layer at a time. The trustee argued that each of these two transfers were preferences as well as transfers which render previously given new value unavailable as a defense under § 547(c)(4)(B). Assuming that the transfers were preferential, they were "avoidable" under § 547(b). Necessarily, then, the two transfers would not be *unavoidable* under any provision of the Code, including §§ 547(c)(1), (2), (3), (4), (5), (6), or (7). Excepting § 547(c)(4) from this laundry list, these two transfers would not be *otherwise unavoidable* under §§ 547(c)(1), (2), (3), (5), (6), or (7) or any other provision of the Code. Since these two transfers would not be "otherwise unavoidable", the debtor *did not make* an

otherwise unavoidable transfer to the creditor; rather, it made two otherwise avoidable transfers. And, since no otherwise unavoidable transfer existed, it follows that "on account of [the new value previously given by the creditor] the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor". In the exact language of the statute even after these two "paying" transfers were made § 547(c)(4)(B) remained satisfied. Simply put, the two transfers could not reduce the level of new value credited against the previous preference because they were not "otherwise unavoidable."

■ Applying this interpretation to the transactions involved in *Bishop* leads to the following result:

| Date | Alleged Preference | New Value | Preference Exposure |
|---|---|---|---|
| 9/27/79 | $18,418.50 | | $18,418.50 |
| 10/3/79 | | $ 9,140.80 | $ 9,277.70 |
| 10/4/79 | | $19,300.00 | $ 0.00 |
| 11/21/79 | | $10,000.00 | $ 0.00 |
| 11/28/79 | $ 1,828.16 | | $ 1,828.16 |
| 12/4/79 | $19,800.00 | | **$21,628.16** |

Contrary to that court's interpretation, the reduction of defendant's liability on the first transfer should not have been limited to $16,812.64, the amount of the new value transfers less the "paying" transfers of November 28 and December 4, as a matter of law. Instead, a question remained as to whether the November 28th and December 4th transactions were otherwise unavoidable. It is conceivable that the transfers were made in the ordinary course or that at that particular point in the preference period the debtor was not insolvent. It is even possible (though doubtful) that the trustee might stipulate that the transfers were not avoidable. In any of these circumstances, the transfers would reduce the amount of new value which the creditor could have asserted as an offset against the September 27, 1979 transfer. However, the court's application of § 547(c)(4) has been read in conjunction with its rejection of the net result rule to produce a bizarre result. Under the case law developing after *Bishop*, a transfer may both "pay" previous new value from the creditor, thus disqualifying that new value as a defense to an earlier preference, and be preferential in and of itself. This Court rejects the *Bishop* paraphrase of § 547(c)(4)(B) in favor of applying the test delineated in the statute.

The interpretation of § 547(c)(4)(B) adopted by this Court is not novel. *In the Matter of Isis Foods, Inc.*, 39 B.R. 645 (Bankr.W.D.Mo.1984) involved a fact pattern similar to the one before the Court in this case. There the court expressly rejected the "unpaid" test set forth in *Bishop* employing a straight-forward reading of the statute:

In *In re Bishop, supra*, the bankruptcy court stated that it was "inclined to agree [with the argument that section 547(c)(4)] is clear and unequivocal on its face." We fully agree. We add that section 547(c)(4) does not contain any language that even suggests that the new value rule contained therein is somehow limited to unpaid invoices.

That section contains only two exceptions to the set off of new value advanced after a payment: (1) when the new value is secured by an otherwise unavoidable security interest; and (2) when, on account of the new value given, the debtor makes an otherwise unavoidable transfer to or for the benefit of the creditor. Neither exception is applicable under the facts of this case. The dictum in the cases relied upon by the appellee to the effect that the new value must be "unsecured" and go "unpaid" is an inac-

curate and confusing paraphrase of the clearly stated statutory purpose.

> The confusion engendered by the gloss formerly placed on the judicially evolved net result rule should be avoided in cases involving the construction and application of the new subsequent advance rule provided in section 547(c)(4).

39 B.R. at 643 (emphasis supplied). Unfortunately the court's admonition has gone unheeded. In its opinion the *Isis* court failed to state that the concern the *Bishop* court's use of the term "unpaid" was intended to address was more precisely dealt with by § 547(c)(4)(B), *i.e.*, that a creditor should not be able to assert that a transfer was "new value" when the estate was otherwise depleted by the debtor's payment for the new value. While such a statement would appear to be unnecessary, evidently it was needed, given the superficiality with which subsequent courts have dealt with the issue.

In support of the *Bishop* rule the Trustee has stated that "[t]he great majority of courts addressing the issue have held that a subsequent advance of new value must remain unpaid to satisfy § 547(c)(4)." Trustee's Brief at 6. The Trustee cites numerous cases which the Trustee asserts do not rely upon the reasoning of *Bishop* but reach a similar conclusion. While a brief discussion of each of these cases is set forth in the appendix to this opinion, suffice it to say that of the thirteen cases cited by the Trustee in support of his interpretation of the statute, in five (including one authored by this judge) the ability of the trustee to use an avoidable transfer to disqualify a transfer from the creditor from serving as new value was not at issue.[4] Several of the remaining cases simply conclude that the rule stated in *Isis* "seems contrary to common sense."[5] *In*

*re Global Int'l Airways Corp.*, 80 B.R. 990 at 992, fn. 4. One of the cited cases may even be read to implicitly take a position contrary to that of the Trustee.[6]

The cases that follow *Global* frequently cite its off-hand dismissal of *Isis* without any examination of the rationale behind the *Isis* decision. *See, e.g. In re Hancock-Nelson Merchantile Company, Inc.*, 122 B.R. 1006 (Bankr.D.Minn.1991). Had they made such an examination, these courts would have found that what was *seemingly* adverse to common sense was a refinement of the common sense rule the courts were striving to create. That is, (1) common sense would dictate that a creditor should not be able to assert a new value transfer as a defense to a preference if the transfer was paid for by the debtor because the estate was not made whole by the new value transfer. But, (2) by the same token, the trustee should not be able to assert the new value was paid if the trustee is asserting that the paying transaction was in fact a preference which the trustee can avoid. By doing so the trustee will be able to eliminate the effect of the payment for the new value when he recaptures the preferential transfer. The statutory language expresses both the exception in sentence (1) and the caveat to the exception in sentence (2). The shorthand "unpaid," however, as employed by *Bishop* and subsequent courts, glosses over the statutory language creating the caveat. Therefore, the refusal of the *Isis* court to adopt the "unpaid" language was not out of lack of recognition that new value for which the creditor was already compensated should not be considered in defense of a preference, but instead arose out of a precise reading of the statutory language embodying that policy.

---

4. *In re Ford,* 98 B.R. 669 (Bankr.D.Vt.1989); *In re Prescott,* 805 F.2d 719 (7th Cir.1986); *In re Formed Tubes, Inc.,* 46 B.R. 645 (Bankr. E.D.Mi.1985); *In re Columbia Packing Co.,* 44 B.R. 613 (Bankr.D.Mass.1984); *In re Camelot Motors Corp.,* 86 B.R. 520 (Bankr.W.D.Mi.1988).

5. *In re Hancock-Nelson Merchantile Company, Inc.,* 122 B.R. 1006 (Bankr.D.Minn.1991); *In the*

*Matter of Global Int'l Airways Corp.,* 80 B.R. 990 (Bankr.W.D.Mo.1987); *In re American Int'l Airways, Inc.,* 56 B.R. 551 (Bankr.E.D.Pa.1986); *In re Prescott,* 805 F.2d 719 (7th Cir.1986).

6. *In re Quality Plastics, Inc.,* 41 B.R. 241 (Bankr. W.D.Mi.1984). See Appendix for a full discussion of this case.

Though in the minority, the *Isis* opinion is more firmly rooted in the statutory language than *Bishop* and its progeny. As a result *Isis* is a hurdle that the Trustee must overcome in order to urge the adoption of the *Bishop* interpretation by this Court. This he attempts to do by arguing the broad policy considerations found in the legislative history.

### B. Legislative History.

 Where a statute is clear on its face the plain meaning of its language should be applied. The rare exception to this rule occurs when doing so would produce a result fundamentally at odds with the intent of the drafters as expressed in the legislative history. *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989); *Covill v. United States*, 959 F.2d 58, 61 (6th Cir.1992). Although the provision at issue in this case does contain a double negative, this fact makes the statute *complicated*, not ambiguous. A mathematical calculation may be exceedingly complex, yet at the end of the exercise there is but one right answer. The same is true of § 547(a)(4)(B). Applying the statute requires several levels of analysis, but each step is clear and the process leads to a single result.

 This conclusion was also reached by the *Isis* court, which likewise determined that § 547(c)(4) is unambiguous. 39 B.R. at 643. The Sixth Circuit gave some indication that it found this section unambiguous when in *In re Fulghum Const. Corp.*, 706 F.2d 171, 174 (6th Cir.1983) it stated that

> [section] 547(c) artfully articulates equitable "defenses" whereby the trustee may be foreclosed from avoiding the preference. In particular, § 547(c)(4) permits a netting procedure to be applied when the debtor and creditor are both recipients and initiators of transactions.

Although that case was concerned with the post-Code applicability of the net result rule, the Court warned against straying from this "artful articulation":

> A "judicial gloss" which significantly restricts the statutory definition of "preference" and pragmatically emasculates the creditor defense thereto as intended by Congress in § 547(c)(4) constitutes nothing less than legislation by judicial decree.

*Id.* at 173. Somewhat presciently, the court did not term the adoption of the net result rule as an emasculation of the trustee's avoiding powers, even though this would have been the effect of its adoption. Instead, the court was concerned with the emasculation of the defense *as intended by Congress*. Where that intent is clearly stated in the statute, the court should not attempt to rewrite the statute on policy grounds.

The Trustee argues that the statute is ambiguous because it contains a double negative "compounded by the inclusion of the word 'otherwise'." Trustee's Brief at 11.[7] Thus freed of the confines of the statutory language the Trustee argues that the "evident purpose" of the provision is to require new value to "remain unpaid", in harmony with the majority of courts applying the statute. *Id.* The rationale employed by the Trustee is somewhat skewed:

> There may also be another fair interpretation of the statutory language. By removing the double negatives and creating a positive statement; i.e. *"on account of which new value the debtor made an otherwise avoidable transfer to or for the benefit of such creditor"*; a clearer meaning seems to appear. Pursuant to this interpretation, a creditor

7. Counsel for the Trustee also argued at hearing on this motion that the statute is ambiguous because it is not clear whether the phrase "on account of" refers to a transfer by the debtor made as a direct consequence of the giving of the new value, or if that phrase is intended to refer only to the particular transaction or contractual relationship out of which the transfers arose. The Court agrees that in this respect the statute may be ambiguous. However, given the reading the Court adopts for the remaining unambiguous portion of the statute, the Court simply assumes without deciding that for the purposes of this motion all of the transfers in question by the debtor were made "on account of" previous new value transfers by the creditor. This assumption favors the Trustee.

would be able to offset subsequent new value against a debtor's preferential payment so long as the new value remained unpaid or, if paid, so long as the payment was *otherwise* avoidable (i.e. so long as the payment was avoidable *other than* under § 547 of the Bankruptcy Code). Trustee's Brief at 14 (emphasis in original). The Trustee makes no direct argument that the double negative gives rise to ambiguity but simply states that it is confusing and is a disfavored use of the language. The Trustee argues that the statute's use of the word "otherwise" could refer to sections of the Bankruptcy Code other than § 547(c)(4)(B) or it could refer to sections of the Code other than § 547. Because it is unclear which of these two options was intended he wrongly concludes that the language is ambiguous.

▇ Removing the double negative from the statute as the Trustee suggests does not result in a translation that is the functional equivalent of the statutory language. Four events might occur after a creditor gives the debtor new value. The debtor might (1) make no transfer at all; (2) make an avoidable transfer; (3) make a transfer unavoidable under either § 547 or § 547(c)(4), depending upon the interpretation adopted; or (4) make an otherwise unavoidable transfer. The statute requires for the assertion of new value that the debtor "did not make an otherwise unavoidable transfer." This could be satisfied in all but one of the four circumstances outlined above. It could be satisfied if the debtor *did* make an *avoidable* transfer (possibility 2), which is covered by the translation suggested by Trustee. But it could also be satisfied if the debtor made *no transfers at all* (possibility 1) to the creditor after the new value was given. If the debtor made no transfers at all after the new value was given, it is easily understood that the exception should apply. By the same token, if the transfer to the creditor after the new value was given was avoidable, the transfer was effectively the same as no transfer at all, and the creditor should still be able to get credit for the new value. These two conceptual prongs, and the third that the transfer might be

unavoidable under the particular provision being applied, are expressed semantically in the statute by elimination of the fourth possibility, that an effective transfer to the creditor was made on account of the new value. The use of a double negative therefore is not ambiguous; its meaning may be difficult to ascertain but is not indefinite. An alternative positive phrasing that does have the same effect was given in *Isis* when the court enumerated as one of the *exceptions* to the new value rule transfers by the creditor on account of which the debtor made an otherwise unavoidable transfer to the creditor. 39 B.R. at 643. This phrasing also singles out one of the four possibilities of no transfer, avoidable transfer, transfer unavoidable under § 547(c)(4), and otherwise unavoidable transfer.

▇ The Trustee's reasoning in which he concludes that the word "otherwise" could mean "other than under § 547" as opposed to "other than under § 547(c)(4)" is an outgrowth of the Trustee's flawed translation and is likewise flawed. The reason for excluding avoidable transfers from deduction from new value is that the creditor in effect did not receive anything for the new value. This holds true whether the transfer is avoidable under § 547 or some other section. The nonsensical result that would obtain if transfers avoidable under § 547 were not within the scope of the protection afforded by § 547(c)(4) can be illustrated by looking at the other types of transfers that can be avoided. For example, 11 U.S.C. § 548 empowers the trustee to avoid fraudulent transfers made by the debtor. Under this section the Trustee may avoid a transfer that has overtones of fraud, and under the Trustee's interpretation § 547(c)(4) would not require deduction from new value for this avoidable transfer because the transfer is avoidable under a provision other than § 547. However, the Trustee *would* deduct from the new value for avoidable preferences where the likelihood of actual fraudulent conduct is much less. At one point in this case the Trustee sued virtually all the creditors of the estate in a class action alleging preferences. It could hardly be said that all these credi-

tor's conduct was wrongful. Yet the Trustee would have deprived these creditors of much of the benefit of the new value defense while those who through actual fraud received transfers from the estate after they gave new value would be able to assert the defense.

The more logical reason for inclusion of the word "otherwise" in the statute is apparent from the plain language of the statute. This is best illustrated by use of another hypothetical:

### Hypothetical # 3

| Transfer No., Date | Alleged Preference | New Value | Preference Exposure |
|---|---|---|---|
| 1. 9/1/92 | $1,000.00 | | $1,000.00 |
| 2. 9/15/92 | | $1,000.00 | $ 0.00 |
| 3. 10/1/92 | $1,000.00 | | $1,000.00 |
| 4. 10/15/92 | | $1,000.00 | $ 0.00 |
| 5. 11/1/92 | $1,000.00 | | $1,000.00 |
| 6. 11/15/92 | | $1,000.00 | $ 0.00 |

In Hypothetical # 3 a preference is received in the amount of $1,000.00 (Line 1). Some time later, the creditor gives the debtor $1,000.00 (Line 2), on account of which the debtor makes another transfer of $1,000.00 (Line 3) which is also preferential. This transfer is not unavoidable because it is a preference (leaving aside the question of "otherwise" for the moment), so it does not diminish the new value defense. After this transfer the creditor gives additional new value in the amount of $1,000.00 (Line 4). Another similar series of transfers occur between the debtor and creditor for like amounts (Lines 5 and 6). At the end of this series of transactions, the creditor has no preference liability. This makes sense, for after each preference the creditor gave new value which replenished the estate for the preference. However, the end result of this series of transactions is that as the creditor received three transfers totalling $3,000.00 that ultimately were *unavoidable;* the creditor has no preference exposure. From this perspective, if the word "otherwise" is disregarded, the debtor made a transfer (Line 5) on account of the new value given on 10/15/92 (Line 4) which was ultimately unavoidable, and this new value must be reduced by that amount. Therefore, the creditor would have exposure of $1,000.00 for the preference of 10/1/92 (Line 3).

Working backwards, the debtor also received $1,000.00 in new value on 9/15/92 (Line 2), but on account of this transfer the debtor gave the $1,000.00 transfer on Line 3 which we originally assumed was unavoidable. Now, however, we have determined that this transfer *is* avoidable. Therefore, the new value given on Line 2 is not subject to a setoff for an unavoidable transfer made on account of it, and it can be used as a defense to the preference on Line 1. If this pattern of transfers were extended further back in time, the net result would be that every other preference would be avoided. This is an unintended result that occurs solely because transactions that were unavoidable under § 547(c)(4) were in turn treated as unavoidable for the purposes of that very section when applied to other series of transactions. To eliminate this result, the word "otherwise" was added, and as this hypothetical demonstrates plainly applies to § 547(c)(4) only.

The foregoing discussion of the interpretation of the statute was deliberately undertaken without turning to the legislative history to demonstrate that all the interpretive aids necessary to the resolution of this case can be found within the statutory language itself. While the Court finds the statutory language unambiguous, an examination of the legislative history would be helpful for two other reasons. First, such

an examination will show that this Court's interpretation of the statutory language is completely in harmony with the legislative intent, satisfying *Ron Pair*. The second consideration is more important in this case: providing a focus to the analysis of the statute in this case. The history most illuminative is that of § 547 in general:

> The purpose of the preference section is two-fold. First, by permitting the trustee to avoid prebankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during his slide into bankruptcy. Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor. Any creditor that received a greater payment than others of his class is required to disgorge so that all may share equally.

H.R.REP. No. 595, 95th Cong., 1st Sess. 177 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6138. The way in which this policy is carried out in § 547(c)(4) can be seen in the evolution of this section from the net result rule. The net result rule was a simple, reliable embodiment of creditor equality. If a creditor enhanced the estate during the preference period the creditor got credit for it. If a creditor received a transfer from the estate the creditor was required to return it. Applying this simple rule to all creditors would put the debtor back to its position 90 days prior to bankruptcy in a simple but exact fashion. However, the net result rule did not further the policy of encouraging creditors to deal with the struggling debtor. In fact, it discouraged further dealings by the creditor who had "banked" a significant amount of new value early in the preference period. Until this entire transfer was reimbursed, the creditor had no incentive to deal with the debtor. To remedy this, the net result rule was modified so that new value could only be used to set off preferences received earlier. Thus, the only sure defense to a preference was to continue dealing with the debtor by supplying additional new value after receiving each preference.

Though simple in concept, this modification to the net result rule had some complications in application. The order of the transfers did not matter under the net result rule because all new value and all preferences would simply be totalled in the end. But by requiring that new value be given after the preference, the positional relationship of each new value transfer to the preferences before and after became significant. Section 547(c)(4), the embodiment of a test which would address the relationship of the asserted new value to previous and subsequent transfers from the debtor, is not simple. But it is comprehensible, and once comprehended, it does effectuate the twin policy concerns expressed by its drafters.

### VI. Applications.

As stated by Water Doctor in its brief, this motion was brought both to resolve the instant case and to clarify the law for other preference cases brought by the Trustee. We address application of the statute in both of these contexts.

### A. The Instant Case.

█ A technical problem arises out of the fact that Water Doctor expressly reserved the right to assert other defenses to the alleged preferences identified by the Trustee. The prayer for relief at the end of Water Doctor's motion states as follows:

> WHEREFORE; without waiving or releasing any of its other defenses as set forth in its Answer, the defendant moves for a summary judgment reducing plaintiff's claim by reason of subsequent new value transfers as provided in Code Sec. 547(c)(4), either to zero as calculated in Exhibit 6 or to a sum not to exceed $81.77, the maximum preference exposure as calculated in Exhibit 7.

The calculation set forth in § 547(c)(4) cannot be undertaken until it is determined that any transfers by the debtor made on account of the new value are not "otherwise unavoidable." Such a determination requires that the Court pass on defenses to these transfers expressly reserved by the Trustee. In this particular case, the value of asserting these defenses seems hardly worthwhile, for the ruling by this Court

will result in a *de minimis* liability for the defendant. However, a different result may occur in other cases. Therefore, the Court declines to enter a judgment limiting Water Doctor's exposure to any amount at this time. Water Doctor may file a waiver of all defenses except the new value defense, or otherwise stipulate to the avoidability other than under § 547(c)(4) of all transfers it received from the debtor excepting those made after the last new value transfer in excess of the outstanding new value balance. Upon the receipt of such a waiver or stipulation, the Court will enter a judgment limiting the Trustee's recovery to the amount calculated below. Any remaining balance then may be defended on other exceptions to avoidability only as those defenses pertain to preferences which occurred after the last new value transfer was exhausted.

The table below shows the transactions which occurred in the instant case, with a calculation of Water Doctor's liability at right based upon the interpretation of § 547(c)(4)(B) adopted in this case, assuming that the Water Doctor stipulates to the to the lack of other defenses as to all transfers except the last $81.77 of the last alleged preference.

| Transfer No., Date | Alleged Preference | New Value | Preference Exposure |
|---|---|---|---|
| 1. 11/1/88 | $1,477.18 | | $1,477.18 |
| 2. 11/1/88 | $ 176.91 | | $1,654.09 |
| 3. 11/10/88 | | $ 211.02 | $1,443.07 |
| 4. 11/15/88 | $ 934.04 | | $2,377.11 |
| 5. 12/6/88 | | $2,006.24 | $ 370.87 |
| 6. 12/9/88 | | $ 43.76 | $ 327.11 |
| 7. 12/12/88 | $ 211.02 | | $ 538.13 |
| 8. 12/13/88 | $1,142.90 | | $1,681.03 |
| 9. 12/14/88 | | $1,252.55 | $ 428.48 |
| 10. 12/20/88 | | $ 881.13 | $ 0.00 |
| 11. 1/6/89 | $2,006.24 | | $2,006.24 |
| 12. 1/6/89 | | $1,142.90 | $ 863.34 |
| 13. 1/10/89 | | $ 781.57 | $ 81.77 |

The total exposure under this assumption would be $81.77.

### B. Additional Hypotheticals.

█ The following hypotheticals are provided in order to assist counsel in performing the appropriate calculations in other pending preference matters. It should be noted that where there is a series of uninterrupted preferences or new value transfers, these may be added together and treated as a single transfer for purposes of performing these calculations. The only exception to this rule occurs where there are a number of unavoidable preferences in a row, some of which are unavoidable under § 547(c)(4) and some of which are unavoidable under other sections of the Code. This scenario is addressed in the last hypothetical. Finally, a flow chart diagramming the logical order of the decision making process under § 547(c)(4)(B) is attached to the appendix for those who may find it helpful.

### *Hypothetical # 4*

| Transfer No., Date | Alleged Preference | New Value | Preference Exposure |
|---|---|---|---|
| 1. 9/1/92 | | $500.00 | $ 0.00 |
| 2. 9/15/92 | $1,000.00 | | $1,000.00 |

Hypothetical # 4 simply demonstrates the requirement that the new value be given after the preference occurs.

### Hypothetical # 5

| Transfer No., Date | Alleged Preference | New Value | Preference Exposure |
|---|---|---|---|
| 1. 9/1/92 | | $500.00 | $ 0.00 |
| 2. 9/15/92 | $1,000.00 | | $1,000.00 |
| 3. 10/1/92 | | $500.00 | $ 500.00 |
| 4. 10/15/92 | $ 500.00 | | $1,000.00 |

In Hypothetical # 5 the transfer on Line 4 is assumed to be an avoidable preference. As previously seen, the new value given on Line 3 may be set off against the liability on Line 2.

### Hypothetical # 6

| Transfer No., Date | Alleged Preference | New Value | Preference Exposure |
|---|---|---|---|
| 1. 9/1/92 | | $ 500.00 | $ 0.00 |
| 2. 9/15/92 | $1,000.00 | | $1,000.00 |
| 3. 10/1/92 | | $ 500.00 | $ 500.00 |
| 4. 10/15/92 | $ 500.00 | | $1,000.00 |
| 5. 11/1/92 | | $1,000.00 | $ 0.00 |

In Hypothetical # 6 the transfer on Line 4 is now unavoidable, but it is unavoidable by virtue of the new value given in Line 5. Because it is unavoidable solely because of § 547(c)(4), it is not otherwise unavoidable and does not decrease the amount of new value in Line 3 which may be asserted by the creditor.

### Hypothetical # 7

| Transfer No., Date | Alleged Preference | New Value | Preference Exposure |
|---|---|---|---|
| 1. 9/1/92 | | $500.00 | $ 0.00 |
| 2. 9/15/92 | $1,000.00 | | $1,000.00 |
| 3. 10/1/92 | $ 500.00 | $500.00 | $1,000.00 |

In Hypothetical # 7 the transfer on Line 3 is unavoidable, but it is unavoidable because it is a substantially contemporaneous exchange. 11 U.S.C. § 547(c)(1).[8] There-fore, it is otherwise unavoidable and be-cause the new value was given on account of it, set off is not allowed to the extent of the unavoidable transfer.

8. This Code section was selected as an example; the transfer might as well have been unavoid-able under any other section of the Code except § 547(c)(4).

### Hypothetical # 8

| Transfer No., Date | Alleged Preference | New Value | Preference Exposure |
|---|---|---|---|
| 1. 9/1/92 | | $ 500.00 | $ 0.00 |
| 2. 9/15/92 | $1,000.00 | | $1,000.00 |
| 3. 10/1/92 | $ 500.00 | $1,000.00 | $ 500.00 |

Hypothetical # 8 is exactly the same scenario as found in Hypothetical # 7 except that the new value given in the substantially contemporaneous exchange exceeds the amount of the unavoidable transfer by the debtor. Because the new value defense is only disallowed under 11 U.S.C. § 547(c)(4)(B) "to the extent" that an unavoidable transfer took place on its account, the remaining unused amount of new value may serve as a defense to the preference on Line 2.

### Hypothetical # 9

| Transfer No., Date | Alleged Preference | New Value | Preference Exposure |
|---|---|---|---|
| 1. 9/1/92 | | $500.00 | $0.00 |
| 2. 9/15/92 | $1,000.00 | | $1,000.00 |
| 3. 10/1/92 | | $1,000.00 | $500.00 |
| 4. 10/15/92 | $ 500.00 [§ 547(c)(2)] | | $500.00 |
| 5. 11/1/92 | $1,000.00 [§ 547(c)(4)] | | $1,500.00 |
| 6. 11/15/92 | | $1,000.00 | $500.00 |

The assumptions for Hypothetical # 9 are that the transfer on Line 4 is unavoidable as a transfer made in the ordinary course of business, 11 U.S.C. § 547(c)(2)[9], and that the transfer on Line 5 is unavoidable under § 547(c)(4) based upon the new value given on Line 6. In addition it is assumed that the transfer on Line 4 was given on account of the transfer on Line 3. The result is that the transfer on Line 3 cannot be used to the extent of $500.00 for the transfer given in Line 4 because that transfer is otherwise unavoidable, but is not affected by the transfer on Line 5 because that transfer is not otherwise unavoidable. This is the exception to adding together uninterrupted strings of preferential or new value transfers and treating them as a single transaction discussed earlier.

### VII. Order.

For the reasons stated in this opinion,

IT IS ORDERED that the motion for summary judgment is denied as to Water Doctor's request that its liability be limited to either zero dollars or $81.77; and

IT IS FURTHER ORDERED that upon the receipt of stipulation or waiver by Water Doctor of all defenses except § 547(c)(4) as to all transfers by CRS to Water Doctor except the final $81.77 of the last such transfer, this Court will enter an order granting Water Doctor summary judgment limiting its exposure in this case to $81.77.

### Appendix

*In re Hancock–Nelson Merchantile Company, Inc.,* 122 B.R. 1006 (Bankr.D.Minn.1991).

This case was factually similar to the instant matter. In this case the court dis-

9. Again, by way of example.

cussed the cases applying § 547(c)(4)(B) but did not interpret the language of the statute itself. Instead it simply stated:

The replenishment of the debtor's operations, however, must be attributable to an actual advance of credit, *which then remains unpaid in whole or in part as of the date of the debtor's bankruptcy filing....* A very few courts have held that the subsequent advance need not remain unpaid, to satisfy § 547(c)(4). *See In re Isis Foods, Inc.,* 39 B.R. 645 (W.D.Mo.1984); *In re Paula Saker & Co., Inc.*[, 53 B.R. 630 (Bankr.S.D.N.Y. 1985)]; *In re Kroh Bros. Development Co.,* 104 B.R. [182] at 195 [(Bkrtcy.W.D.Mo.1989)]. However, the great majority of courts addressing the issue have concluded that the *Isis Foods* holding "seems contrary to common sense and the clear intent of the statute." [Citations omitted].

122 B.R. at 1016 (emphasis supplied). The language emphasized has no root in the statute. The court continued:

The majority rule on this issue is indeed the one which makes sense. Allowing the offset of a *satisfied* subsequent advance may give lip service to the statutory goal of encouraging continued dealings with distressed businesses, but it does so at the cost of tipping the statutory balance of economic considerations over to the creditor-supplier's side.

*Id.* (emphasis in original). The court's use of the word *"satisfied"* begs the issue in these cases; if the satisfaction is in itself avoidable it ultimately provides no satisfaction at all. Moreover, the statute does not call for the court to engage in a weighing of the competing interests of the supplier and debtor but instead requires the application of a precise mathematical formula. The "statutory balance" already struck by Congress should not be disturbed by judicial legislation.

*In the Matter of Global Int'l Airways Corp.,* 80 B.R. 990 (Bankr. W.D.Mo.1987).

The court's entire cursory discussion of the § 547(c)(4)(B) issue is set forth in a footnote and repeated here:

The rule of *Matter of Isis Foods, Inc.* [citation omitted] that the subsequent value may have been paid for and still meet the requirements of § 547(c)(4), seems contrary to common sense and the clear intent of the statute and has been rejected by subsequent authority.

80 B.R. at 992, fn. 4. This "sound bite" has been repeatedly cited in following opinions. Interestingly, however, the defendant asserting the new value defense in that case gave $122,950.13 in new value, of which $122,233.71 was given after the last alleged preference. After evaluating the defendant's § 547(c)(2) defense the court determined $54,246.50 was the maximum exposure and was entirely erased by the subsequent new value which came after the last preference. Thus, the § 547(c)(4)(B) issue had a maximum possible impact of $716.42, and ultimately made no difference at all. Given the outcome of the case it is hardly surprising that the court gave the § 547(c)(4)(B) issue no more than cursory review. Yet its offhand statement is cited in more than one case, and is relied upon by the Trustee in this case.

*In re Ford,* 98 B.R. 669 (Bankr.D.Vt.1989).

This case contains a lengthy discussion of the net result rule and its § 547(c)(4) successor. There were no transfers made by the debtor after the alleged new value transfer, and so this issue was addressed by use of the "unpaid" shorthand and a string citation of concurring authority.

*In re American Int'l Airways, Inc.,* 56 B.R. 551 (Bankr.E.D.Pa.1986).

This case has the same fact pattern as the case at bar. The court cited *Isis* and directly quoted the passage in which that opinion stated that the term "unpaid" is "an inaccurate and confusing paraphrase of the clearly stated statutory exceptions." 39 B.R. at 653. Rather than looking at the statute to see why the term "unpaid" is an inapt paraphrase, however, the court then simply stated that the "overwhelming majority of courts hold directly opposite the holding *Isis Foods,* that is, the new value must go unpaid in order for § 547(c)(4) to apply." 56 B.R. at 554. The court cites *Bishop* and subsequent cases. The only

reasoning that the court gave for its holding was a quote from Judge Brody's *Formed Tube* opinion, discussed below.

*In re Prescott*, 805 F.2d 719 (7th Cir.1986).

Two preference defendants raised § 547(c)(4) in this case. The first creditor was a secured creditor whose position changed from undersecured to oversecured during the preference period, and the second was a junior secured creditor whose position correspondingly improved. The pattern of transactions was somewhat similar to that in the instant case, but it does not appear that the "paying" transactions were challenged as preferences themselves. The trustee's attack was aimed at two large transactions: the cashing of a certificate of deposit and the setoff of a depository account. The "paying" transactions under these circumstances would also have been "otherwise unavoidable". Therefore, even though the facts were similar to those in this case, the issue before this Court never was directly in contention in *Prescott*.

*In re White River Corp.*, 50 B.R. 403 (Bankr.D.Colo.1985).

This case involved the ongoing payment by the debtor of rent for a leased oil drilling rig. The trustee challenged rent payments made during the preference period at the original lease rate and at the rate under a lease amendment entered during the preference period. The trustee also sought to avoid an additional security deposit paid during the preference period pursuant to the lease amendment. The defendant asserted that the continued possession of the property after the preferences occurred constituted new value. The entire discussion of § 547(c)(4)(B) in which the court rejects this defense is set forth:

> For Section 547(c)(4) to apply, three requirements must be met: (1) The creditor must extend new value as defined in Section 547(a)(2). (2) The new value must be unsecured. (3) The new value must go unpaid. *Matter of Bishop*, 17

B.R. 180, 183 (Bankr.N.D.Ga.1982). The defendants fail to meet the third requirement since they ultimately received full satisfaction for any rental claims they might otherwise have against the debtor. The defendants stipulated that they received monthly lease payments through January 12, 1982, from Dunne–Gardner, the debtor's joint venturer. This covers in the entirety any new value extended by the defendants and renders relief under Section 547(c)(4) inapplicable.

50 B.R. at 409–410. The court concluded that because a third party paid the rent for the debtor, the transfers of new value in the form of continued possession of the leased property had been paid, further broadening the *Bishop* paraphrase. It is questionable whether transfers from a party other than the debtor would prevent the creditor from asserting the new value defense, contrary to the *White River* court's holding, because the statute refers to a otherwise unavoidable transfer by *"the debtor."* These facts were not before the court in *Bishop,* and yet the "unpaid" terminology was used in *White River* without analysis as a mechanism to read language into the statute which is not there.[10] The *White River* case provided no insight to the subsequent transfer issue but instead muddied the waters further.

*In re Formed Tubes, Inc.*, 46 B.R. 645 (Bankr.E.D.Mi.1985).

There was no argument that payment was made for the new value with another preference:

> [I]f the creditor obtains a security interest to secure payment of the new value or is paid for the new value by the debtor, there is in effect no return of the preference and the section 547(c)(4) defense is not available to the creditor.... Armco was not granted a security interest in property of the debtor for the new value, nor was Armco paid for the new value by the debtor.

46 B.R. at 647. Therefore, the § 547(c)(4)(B) issue never arose. The court

---

**10.** Although this fact pattern appears in the case at hand, the Court reiterates Water Doctor and the Trustee do not dispute that the Comerica payments should not be deducted from the asserted new value.

noted that the parties stipulated that *Isis* was wrongly decided, but this stipulation was irrelevant to the outcome of the case, since there was no paying transfer made by the debtor subsequent to the new value transfer.

*In re Keydata Corp.*, 37 B.R.
324 (Bankr.D.Mass.1983).

In this case the trustee challenged payments made to a public utility for electricity supplied to the debtor on an ongoing basis. The relevant passage:

> For Section 547(c)(4) to apply, three requirements must be met: the creditor must have extended the new value after receiving the preference; the new value must have been unsecured; and, the new value must remain unpaid. *Matter of Bishop* [citation omitted]. Under this formula, the value of the utility service provided to the debtor after the preference payment for earlier service may be offset against the preference payment, as long as the new value remains unpaid. [Citations omitted].

37 B.R. at 328. The entire discussion of the issue is a rote recitation of *Bishop*. There is no independent analysis of the statutory language.

*In re Columbia Packing Co.*, 44 B.R.
613 (Bankr.D.Mass.1984).

This case dealt with the nature of the claim against the estate a creditor has remaining after the avoidance of a preference, and mentions cases such as *Keydata* and *Bishop* only in passing.

*In re Camelot Motors Corp.*, 86 B.R.
520 (Bankr.W.D.Mi.1988).

This opinion was authored by this Court. Although the shorthand term "paid" was used in generally stating the requirements of § 547(c)(4)(B), in that case (as in many others cited by the Trustee) the payment of the new value with a preference was not at issue because there were no subsequent transfers after the asserted new value; the parties stipulated that the *Bishop* test had been met.

*In re Quality Plastics, Inc.*, 41 B.R.
241 (Bankr.W.D.Mi.1984).

This opinion authored by Judge Howard neither addresses nor adopts the flaw in the *Bishop* analysis. In that case, the issue was whether the debtor's subsequent use of leased equipment constituted new value for lease payments made to the defendant. The court cited to *Bishop* and its triparte summary of the Code provision. It then stated, "There is no question that various rental obligations due to the defendant between September, 1981 and May, 1982, are unsecured and unpaid." 41 B.R. at 242. This result is inconsistent with the Trustee's interpretation of *Bishop*. In *Quality Plastics* four lease payments were challenged as preferences. The various transfers between the parties are set forth below:

| Date | Alleged Preference | New Value |
|---|---|---|
| 9/17/81 | $3,000.00 | |
| 9/18/81—10/6/81 | | $ 958.20 |
| 10/6/81 | $3,000.00 | |
| 10/7/81—11/13/81 | | $ 1,326.90 |
| 11/13/81 | $2,500.00 | |
| 11/14/81—12/15/81 | | $ 997.68 |
| 12/15/81 | $2,000.00 | |
| 12/16/81—5/14/82 | | $ 691.80 |
| 12/16/81—5/14/82 | | $12,545.40 |

Despite the interwoven series of transactions which normally set the stage for *Bishop* the court did not treat the "paying" preferences as satisfying the earlier new value transfers. It should be noted that the last transfer from the creditor would

have been sufficient to satisfy all of the preferences. Nevertheless, the court focused on new value given from September 1981 to May 1982, which includes the interwoven new value. This new value would have been subject to challenge under the Trustee's interpretation of *Bishop*.

The analysis required to resolve this ordering problem can be depicted on a flow chart. The series of transactions utilized in the flow chart are as follows:

| Alleged Preference | New Value |
|---|---|
| $P_1$ | $NV_1$ |
| $P_2$ | $NV_2$ |

The question to be addressed in the flow chart is, "To what extent may $NV_1$ be offset against $P_1$?" The flow chart assumes that $NV_1$ was made after $P_1$ and that $P_2$ was made on account of $NV_1$.

START

Is $P_2$ avoidable? ———————→ Yes ——→100% of $NV_1$ may be offset.

No

Is $P_2$ unavoidable by virtue of § 547(c)(4)?—→Yes ——→100% of $NV_1$ may be offset.

No

Is $NV_1 > P_2$? ———————→ Yes ——→$NV_1$—$P_2$ may be offset.

No

0% of $NV_1$ may be offset.